## W. F. GORDON, Administrator of Estate of HARRY L. PANGLE, v. KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant.

### Division Two, July 13, 1909.*

1. **NEGLIGENCE: Defective Car: Defendant's Knowledge :Cause of Injury.** Where a switchman sues for damages for personal injuries received by him while attempting, in the line of his employment, to uncouple a caboose attached to a moving train, charging his injuries to be due to a defective handrail which gave way as he was in the act of mounting the car, the burden is upon him to prove (1) that the defect in the handrail existed at the time and was the cause of the injury, and (2) that defendant had knowledge, either actual or constructive, for a sufficient length of time prior to the injury, to have enabled it, by the exercise of reasonable care, to repair the defect. But it is not necessary to prove either of these essential elements of his case by direct and positive testimony, but they may be established by facts and circumstances.

2. ———: ———: ———: ———: **Plaintiff's Testimony.** According to the plaintiff's testimony the handhold of the caboose, which he took hold of in order to get upon the car for the purpose of uncoupling it, was loose, shaky and wabbly, and would play backward and forward eight or nine inches, and it was then in exactly the same condition it was two weeks before when it was on the track leading to the repair shop. *Held*, that it was the duty of defendant to keep the handrail in a reasonably safe condition for its employees required to use it, and that the court cannot hold that there was no evidence of negligence on defendant's part without ignoring the plaintiff's testimony, and that the court has no right to do.

3. **LIBERAL CROSS-EXAMINATION: Memorandum Book.** A liberal cross-examination of an adverse or unfriendly witness is permissible, for the purpose of ascertaining his feelings or bias, or for testing his memory respecting the facts to which he has testified. And where the witness had testified that he had inspected the car, whose defective handrail plaintiff's evidence tended to show caused plaintiff's injury, and found no defect in the car, and that his memorandum book so showed, it was permissible to permit plaintiff, by liberal cross-examination, not only to test his memory, but the accuracy and reliability of his memoranda.

---

*Note.—Decided May 18, 1909. Motion for rehearing filed. Motion overruled July 13, 1909.

4. **EVIDENCE:** Admission of Employee: Impeachment: Res Gestae. Where the switchman's testimony tended to show a loose and wabbly handrail on the car and that such defect caused his injury, and defendant's yard foreman testified that he examined the handrail about an hour and a half after the accident and found it in good condition and that it was not loose or wabbly, it is proper, for purposes of impeachment, to permit plaintiff's mother to testify that, about an hour after the accident, she asked the same yard foreman how her son was injured and that he said her son "took hold of that old loose handrail of the caboose and fell," and that he had "been trying to have it put in the repair shops for a month." The statements of the foreman, being in reference to a past event, upon which he had no authority from defendant to speak, were not admissible as a part of the *res gestae*, but they were admissible as contradictory of his testimony on a material matter, proper foundation for his impeachment having been laid by asking him if he had not made the statements to plaintiff's mother.

5. ———: ———: ———: **Hearsay.** And though the mother testified that the foreman made the statement about an hour after the accident and the foreman testified he examined the handrail about an hour and a half after the accident and then found it to be in good condition, the foreman's statements cannot be held to have been mere hearsay, since the record does not show that the statements he made to the mother were based upon what he had heard, but it shows that he made them of his own personal knowledge and as facts.

6. **CONTRIBUTORY NEGLIGENCE:** Mounting Moving Car: Custom. Where a custom prevailed in the yards for the switchmen to go upon moving cars to uncouple them, and plaintiff was directed by the foreman to hurry, it was not negligence, as a matter of law, for the switchman to attempt to board a car moving four miles an hour.

7. ———: **Safer Way:** Boarding at Front End: Caboose. Where the doors of cabooses were generally locked as they came into the yards, and the time for uncoupling the caboose before the train reached the switch was short, the switchman was not, as a matter of law, guilty of negligence in trying to board the caboose at the front end where the uncoupling was to be done, even if the rear end was safer. At most his contributory negligence was a question for the jury.

8. ———: **Uncoupling:** Not Using Lever. The switchman, in attempting to uncouple the caboose, was not guilty of contributory negligence in not using the lever at the side of the car, it being necessary for him to get on the platform in order to put on the brake and stop the car before the train reached the switch.

9. **EVIDENCE: Bias of Witness: Drunkenness.** It was not reversible error to permit plaintiff, on cross-examination of defendant's conductor, who had given damaging testimony against plaintiff, to ask him if he had not been discharged by defendant for drunkenness and now had an application on file for reinstatement. The evidence showing the witness was in the habit of getting drunk was, of itself, inadmissible, but it was incidental to the more important question of his discharge and his application for reinstatement, which went to affect his credibility, by indicating his bias and interest in the suit, and it is always permissible to permit a showing of a witness's bias or interest.

10. **JUROR: Dismissal of Panel.** There is no merit in defendant's contention that the court should have dismissed the entire panel because one man was excused because he testified that he had read about the case in newspapers and thought at the time that plaintiff should have damages, but the matter then passed out of his mind and he had thought no more about it.

11. **EXCESSIVE VERDICT: $35,000.** The plaintiff was an able-bodied man, twenty-nine years old, earning $90 per month. His back and five ribs were broken, his pelvis and hip bones mashed, and he was bruised throughout his entire body. His injuries resulted in total paralysis from the middle of his back down, so that he had no control of the functions of the body, and could not sit up except when propped by pillows. His suffering during his life thereafter was intense. He appeared at the trial, but since has died. The verdict was for $50,000, and the trial court required a *remittitur* of $15,000. *Held*, that the judgment for $35,000 is still excessive by $10,000, and plaintiff is required to file a further *remittitur* of that amount as a condition of affirmance, the balance to bear interest from date of verdict.

Appeal from Vernon Circuit Court.—*Hon. L. W. Shafer*, Judge.

AFFIRMED ON CONDITION.

*S. W. Moore, Cyrus Crane* and *H. C. Clark* for appellant.

(1) The evidence as to defendant's negligence was not sufficient to warrant the submission of this case to the jury. (a) The necessary elements were

not established by the evidence. Bowen v. Railroad, 95 Mo. 268; Hamilton v. Railroad, 123 Mo. App. 619; Burnes v. Railroad, 129 Mo. 53; Glasscock v. Dry Goods Co., 106 Mo. App. 663; Hester v. Dold Packing Co., 84 Mo. App. 451; Bennett v. Lumber Co., 116 Mo. App. 710; Kelly v. Railroad, 105 Mo. App. 375; Howard v. Railroad, 173 Mo. 531; Murphy v. Railroad, 71 N. W. 662; Johnson v. Railroad, 36 W. Va. 73; Railroad v. Thompson, 11 Tex. Civ. App. 658; Perry v. Railroad, 65 N. W. 608; Railroad v. Wagoner, 33 Kan. 667; Carruthers v. Railroad, 55 Kan. 600; Ahearn v. Railroad, 45 Atl. 1032; Riley v. Campbell, 59 Fed. 990; Railroad v. Ledbetter, 8 Pac. 411. (b) The presumption existed that the master had done his duty in keeping the instrumentalities in a reasonably safe condition. Wood on the Law of Master & Servant, sec. 382, p. 754; Glasscock v. Dry Goods Co., 106 Mo. App. 657; Franklin v. Railroad, 97 Mo. App. 482; Railroad v. Lindamood, 78 S. W. 100; Kincaid v. Railroad, 29 Pac. 3; Duntley v. Inman, etc., 42 Ore. 334; Droney v. Doherty, 186 Mass. 205. (2) The court erred: (a) In admitting testimony of repairs made on caboose car No. 531 after the accident occurred. 1 Elliott on Evidence, sec. 228, p. 327; Ely v. Railroad, 77 Mo. 36; Hipsley v. Railroad, 88 Mo. 348. (b) This error was not cured by the instruction given at plaintiff's request, attempting to limit the effect of this testimony. Cobb v. Griffith, 12 Mo. App. 130; Meyer v. Lewis, 43 Mo. App. 417; Mueller v. Weitz, 56 Mo. App. 36; Stephens v. Railroad, 96 Mo. 207; Seafield v. Bohne, 169 Mo. 546. (3) The court erred in admitting evidence of the declarations of Manker, the yardmaster, which were not part of the *res gestae* and were not binding on defendant. 1. The declaration was not part of the *res gestae* and was not proper as an admission against defendant's interest. Koenig v. Railroad, 173 Mo. 698; Ruschenberg v. Railroad, 161 Mo. 70; Adams v. Railroad, 74 Mo. 553; Barker

v. Railroad, 126 Mo. 143; Devlin v. Railroad, 87 Mo. 545. 2. The declaration admitted was not competent as impeaching testimony. Hamburger v. Rinkel, 164 Mo. 398; Roe v. Bank of Versailles, 167 Mo. 406; Wojtylak v. Coal Co., 188 Mo. 288; Covey v. Railroad, 86 Mo. 635. (4) The court erred in allowing the case to go to the jury, because plaintiff was guilty of negligence as a matter of law. 1. In doing the work when the train was in motion instead of at a standstill. 2. In boarding the caboose at the front end instead of the rear end. Bailey's Personal Injuries Relating to Master and Servant, secs. 1121 and 1123; Moore v. Railroad, 146 Mo. 572; Hurst v. Railroad, 163 Mo. 309; Smith v. Forrester-Nace Box Co., 193 Mo. 715; Patton v. Railroad, 179 U. S. 658. 3. In not using the lever to the automatic coupler. Federal Safety Appliance Act, sec. 2; Gilbert v. Railroad, 128 Fed. 529; Dawson v. Railroad, 114 Fed. 870; Morris v. Duluth, 108 Fed. 747; Railroad v. Brady, 161 Fed. 719. (5) The court erred in permitting plaintiff to show on cross-examination of Conductor Marsh that he had been discharged for drunkenness. 1 Elliott on Evidence, sec. 167, p. 229; 3 Ency. of Evidence, p. 756; State v. Grant, 144 Mo. 63; Hancock v. Blackwell, 139 Mo. 445; Vawter v. Hultz, 112 Mo. 639; Culbertson v. Railroad, 140 Mo. 57; Shaefer v. Railroad, 98 Mo. App. 454; State v. Clawson, 30 Mo. App. 143; Seymour v. Farrell, 51 Mo. 97; Wright v. Kansas City, 187 Mo. 693; State v. Rogers, 108 Mo. 202; State v. Gesell, 124 Mo. 535. (6) The damages are excessive. Markey v. Railroad, 185 Mo. 366; Devoy v. Railroad, 192 Mo. 225; Waldhier v. Railroad, 87 Mo. 37; Furnish v. Railroad, 102 Mo. 438; Burdict v. Railroad, 123 Mo. 236; Nicholds v. Plate Glass Co., 126 Mo. 68; Rodney v. Railroad, 127 Mo. 676; Hollenbeck v. Railroad, 141 Mo. 112; Markey v. Railroad, 185 Mo. 365; Chitty v. Railroad, 166 Mo. 443; Stolze v. Railroad, 188 Mo. 581; Rey-

nolds v. Railroad, 189 Mo. 408. (7) In this case a mere *remittitur* will not be sufficient to cure the wrong verdict of the jury as manifested in the excessive award made. This excessive award, coupled with the further errors in the record and with the whole proceedings as disclosed by the record, shows clearly that the verdict was the result of passion and prejudice, or in other words, was not a just, true and fair verdict. Lindsay v. Kansas City, 195 Mo. 182; Norris v. Whyte, 158 Mo. 36; Spohn v. Railroad, 87 Mo. 84; Cook v. Railroad, 94 Mo. App. 417; Fullerton v. Fordyce, 144 Mo. 519; Nicholds v. Crystal Plate Glass Co., 126 Mo. 68.

*Scott & Bowker, Arthur F. Mullen* and *M. F. Harrington* for respondent.

(1) Owing to the severe and terrible character of the injuries and suffering sustained by the respondent in this case, the judgment of the court entered therein is not excessive. Waldheir v. Railroad, 87 Mo. 37; Devoy v. Railroad, 192 Mo. 197; Markey v. Railroad, 185 Mo. 365; Reynolds v. Railroad, 189 Mo. 408; Stotler v. Railroad, 200 Mo. 107; Smith v. Whittier, 95 Cal. 279; Friedman v. Railroad, 41 Ill. App. 270; Erickson v. Railroad, 32 N. Y. Supp. 915; Ehrman v. Railroad, 60 Hun 580; Herrald v. Railroad, 24 Hun 184; Witrak v. Railroad, 65 N. Y. Supp. 257; Fonda v. Railroad, 79 N. W. 1043; Kelley v. Railroad, 80 S. W. 1073; Whitehead v. Railroad, 114 N. W. 467; Reeves v. Gas Co., 92 Pac. 89; Snell v. Waters-Pierce Oil Co., 106 S. W. 107; Wallace v. Railroad, 45 So. 857; Barton v. Railroad, 130 Ill. App. 573. (2) The fact that one witness is contradicted by a number of witnesses, or as many as twelve witnesses, and that the verdict of the jury is based upon the testimony of the one witness, is no ground for saying that the verdict of the jury is the result of passion, prejudice

or corruption. Drake v. Kansas City, 190 Mo. 370; Widman & Co. v. St. Joseph, 191 Mo. 459. (3) The question of whether or not respondent was guilty of contributory negligence at the time he received his injury, under the testimony in this case, was a question for the jury. Brady v. Railroad, 206 Mo. 509; Edington v. Railroad, 204 Mo. 61; Curtis v. McNair, 173 Mo. 270; Charlton v. Railroad, 200 Mo. 413; Dean v. Railroad, 199 Mo. 386; O'Mellia v. Railroad, 115 Mo. 205; Murphy v. Railroad, 115 Mo. 111; Hollenbeck v. Railroad, 141 Mo. 97. (4) It was negligence on the part of appellant to have a car in use upon its railroad with a defective handrail. Parsons v. Railroad, 94 Mo. 286; Settle v. Railroad, 127 Mo. 336. (5) Evidence of custom in the character of tools and appliances furnished and in general use, and also the manner and method of performing certain services, is admissible on the question of negligence and contributory negligence. Brady v. Railroad, 206 Mo. 509; Eddington v. Railroad, 204 Mo. 61; O'Mellia v. Railroad, 115 Mo. 205; Minnier v. Railroad, 167 Mo. 99; Minnier v. Railroad, 115 Mo. App. 152. (6) The question of whether or not respondent pursued the safest course, or rather a dangerous course to perform his duty for the appellant at the time he was injured, or pursued such a course as would make him guilty of contributory negligence under the doctrine that when there is a safe way and an unsafe way for the servant to perform his duty, was for the jury. Brady v. Railroad, 206 Mo. 509; Eddington v. Railroad, 204 Mo. 61; Murphy v. Railroad, 115 Mo. 111; O'Mellia v. Railroad, 115 Mo. 205. (7) A party has a right to show that a witness who has testified to material facts in issue has made contradictory statements in regard to such matters even after the accident for the purpose of impeaching the credibility of such witness. Spohn v. Railroad, 101 Mo. 417; Mullen v. Railroad, 196 Mo. 572; State v. Forsha, 190 Mo. 296; Kenner v. Railroad,

69 Mo. App. 312; Hamilton v. Mining Co., 108 Mo. 364; Fry v. Railroad, 200 Mo. 406; Spohn v. Railroad, 122 Mo. 1. (8) A wide latitude is allowed on cross-examination of an opposing witness and any question tending to test his memory, means of knowledge, accuracy and veracity is admissible, and such an examination is largely within the discretion of the trial court. Mebford v. Railroad, 121 Mo. App. 647; State v. Nelson, 101 Mo. 464; State v. Boyd, 178 Mo. 2; Richards v. Bank, 119 Mo. App. 18; State v. Smith, 190 Mo. 706. (9) Even where testimony is admissible for some purposes and is so admitted by the court at the time without limiting its effect, yet where the court does limit the effect of such testimony by proper instructions, this is all that is necessary. Bennen v. St. Louis, 92 Mo. 482; McDermit v. Railroad, 87 Mo. 285; Farmer v. Farmer, 129 Mo. 530; Baustian v. Young, 152 Mo. 317; Garesche v. College, 76 Mo. 332. (10) The cross-examination of J. W. Marsh, the conductor, showing that he had been discharged for drunkenness, was not erroneous. The matter of cross-examination is largely within the discretion of the trial court and is not reversible error unless grossly abused. Hirsch v. Green, 83 Mo. App. 487; State v. Hack, 118 Mo. 92; State v. Boyd, 178 Mo. 2; State v. Harris, 150 Mo. 56.

BURGESS, J.—This is an action for damages for personal injuries, in which Harry L. Pangle, now deceased, recovered a verdict for $50,000, but which was reduced by the trial court to $35,000, and judgment entered for that sum. Defendant's motions for a new trial and in arrest of judgment having been overruled, an appeal was taken to this court.

Harry L. Pangle was employed as switchman by the defendant company in its railroad yards in the city of Pittsburg, Kansas. His duty as switchman re-

quired him to follow the switch engine, and switch
and uncouple cars, and to meet trains coming into
the yards and make such disposition of them as might
be ordered by the yard foreman. Pittsburg was a di-
vision point on defendant's line, and engines, ca-
booses and train crews were changed there. The de-
fendant's switch-yards extended some distance south
of the station. South of the yards the defendant's
line was crossed twice by the Frisco tracks, and fur-
ther north was the Santa Fe railroad crossing. In-
coming trains from the south stopped at the first Fris-
co crossing, if the gate which was there for protection
was turned against them, and always stopped before
reaching the next Frisco crossing, further north, with-
out any signals whatever. At the Santa Fe crossing
the trains from the south also stopped unless there
was a yardman present to signal them to cross. Fur-
ther north, and at a point where the defendant com-
pany's switches commence, was a box fixed on a post,
in which box it was customary to put slips containing
directions for the trainmen of the different trains as
to what track they should take in coming into the
yards.

On the 16th day of April, 1904, the day of the in-
jury complained of, a freight train was due to arrive
from the south, its destination being Kansas City,
Missouri, and at Pittsburg the train crew, engine and
caboose on this train had to be changed. This was
known as a "hurry-up-train," being largely composed
of fruit cars, and was required to be operated quickly
and sent on to Kansas City. Just before the time the
train was bound to arrive, C. H. Manker, the yard
foreman, ordered Pangle to take a caboose down to
the south end of the yards to attach to this train, and
also ordered him to take the slip out of the box in ques-
tion containing directions for this train, and send
the train up the main line, and to cut off the caboose
and "clear the switch," the yard foreman stating to

him at the same time that he was in a hurry to get the train out. Pangle and his associate, Meeks, as directed by Manker, attached a caboose to an engine and placed this caboose, which was to be attached to the train, at a switch. He then took the slip out of the said box, and proceeded south to meet the train and execute the other orders of the foreman. After the train had crossed the last Frisco crossing, some distance south of the company's switches, Pangle gave a signal indicating that the train should keep to the main line, and as the engine passed slowly by him he told the engineer and the head brakeman, who was on the engine, to pull up on the main line, and he then went south to meet and get on the caboose and uncouple it. The train was then moving at a speed of about four miles an hour. In order to cut off the caboose and clear the switch it was necessary to get up on the forward end of the caboose and turn the angle cock to let out the air and pull out the pin that coupled the caboose to the next car. As the caboose came by him he reached out and took hold of an upright iron handrail on the forward end of the car, which handrail was used by any one attempting to get on the steps. This handrail, however, was very loose, and as Pangle grasped it in attempting to get on, it swayed or wabbled backwards some seven or eight inches, causing his foot to miss the step. He then got his left knee on the bottom step, his right foot being dragging on the ground, and as he attempted to pull himself up the handrail flopped forward ten or twelve inches, causing him to lose his hold and to fall between the steps of the caboose and the forward car. He was caught by the truck frame or brake-beam of the caboose, doubled up and rolled over, and received injuries of the most serious and painful character. His back was broken, as were several of his ribs, and he was bruised and maimed in his entire body. He was taken to a Kansas City hospital, and later to a hospi-

tal at Chicago, where he was operated upon by Dr. Senn, an eminent surgeon. He became totally paralyzed from the dorsal region down, needed assistance all the time in the performance of the functions of his body, and at the time of the trial his body had to be propped up and supported on the witness chair. According to counsel, Pangle died of his injuries about a year after the trial.

The testimony on the part of plaintiff showed that the defendant company maintained a repair shop at Pittsburg, and that when a car needed repairing it was placed on the tracks leading to the repair shop and marked with a red tag indicating that it was in "bad order." Pangle testified that about two or three weeks prior to the date of the injury, he and one Meeks took this same caboose, the number of which was 531, and placed it on the track leading to the repair shop, and that it was then marked with a "bad-order" tag. He noticed at the time that the handrail referred to was loose and shaky, and saw Mark Ditto, an employee of the company, examine and shake said handrail, and as he shook it its movements would loosen the ratchet that held the brake on the end of the caboose. Pangle further testified that after a car which was in bad condition was marked with a "bad-order" tag and placed on the tracks leading to the repair shop, the general rule was that when the car again came out it was in good order, and that on the 16th day of April, 1904, when he attempted to board the caboose in question he did not know its actual condition nor the condition of the handrail, but he "believed it to be all right." He had not seen this caboose from the time he saw it placed on the repair track until he attempted to mount it on this day. It was further shown by the evidence that during all the time Pangle worked for the defendant company it was the custom in the Pittsburg yards to couple and uncouple cars while the train was in motion, as well as

while standing still, and that cars were coupled and uncoupled while moving at a speed of "six and eight and ten miles, and as high as twelve miles an hour."

There was no evidence that said caboose received any repairs from the time Pangle saw it on the repair track, in bad condition, until the time he attempted to board it and received the injuries complained of, but there was evidence that it was repaired some time after the 16th day of April, 1904.

Several witnesses, employees of the defendant, testified on defendant's behalf that they inspected the handrail in question on the day of the injury and found it in good condition. Among these witnesses was C. H. Manker, the yard foreman, who testified that he examined the handrail on this caboose about an hour and a half after the accident, and that he "didn't find any loose or shaky." It appears from the testimony, however, that shortly after the accident Manker was at Pangle's home, and that while there Mrs. Mary J. Pangle, mother of the injured man, asked him how the accident occurred, whereupon Manker replied, "Oh, Harry got hold of that old loose handrail of the caboose, and fell. I have been trying to get them to put that caboose in the shops for a month, and I guess they will put it in now."

At the time Pangle was injured he was twenty-nine years of age, and married, and was earning $3.08 per day, or about $90 per month. He had worked for other railroads as brakeman and switchman for about six years, and had been working for the defendant some six months.

The first question presented for our consideration upon this appeal is whether there was sufficient evidence of negligence on the part of the defendant to take the case to the jury. Defendant insists there was not.

We assume that the burden was upon the plaintiff to prove, first, that the defect in the handrail existed

at the time of the injury, and that such defect was the cause of the injury, and, second, knowledge on the part of the defendant, either actual or constructive, for a sufficient length of time prior to the injury to have enabled it, by the exercise of reasonable care, to repair the defect. But it was not necessary to prove these by direct and positive testimony, but they might be established by facts and circumstances, if sufficient.

To hold that there was no evidence of negligence on the part of the defendant would be to ignore the testimony of the plaintiff himself—something we have no right to do. According to his testimony, the handrail of the caboose, which he took hold of in order to get upon the car, was loose, shaky and wabbly, and that it would move backwards and forwards some eight or nine inches, that it was then in exactly the same condition as when he saw it some two weeks before, when the caboose was on the tracks leading to the defendant's repair shop.

It was the duty of the defendant to keep its cars, cabooses, and the handrails thereof in a reasonably safe condition for its employees who had to work with such instrumentalities, and there was evidence to show that it had not done so in this instance, the weight of such evidence being for the jury. So, with respect to defendant's knowledge of the dangerous condition of the handrail of the caboose, the evidence showed that the defect in the handrail had existed for a sufficient time prior to the injury for the plaintiff to have known it, or by the exercise of reasonable care and diligence to have discovered said defect, and repaired the same before the injury occurred. Both these issues were submitted to the jury by proper instructions, and the issues found in favor of the plaintiff.

It is next insisted that the court admitted testimony of repairs made upon said caboose after the injury occurred, and in so doing committed error. We

have been unable to find in the record any evidence of such repairs subsequent to the injury, except such as was brought out by defendant's counsel in the redirect examination of defendant's witness, A. F. Marsh, as follows: "Q. Sometime afterwards it [the caboose] was painted and fixed up, wasn't it? A. Yes, sir. Q. Do you remember when that was? A. No, I don't."

Defendant also complains of the action of the court in permitting the cross-examination of defendant's witness, J. A. Murphy, the car inspector. This witness testified to facts with reference to the condition of the caboose on the day of the injury, and for a month prior thereto. His testimony was based upon entries made in a record in which, as he testified, he kept the number of said car and a record of the repairs made thereon. Part of his testimony, on direct examination, was as follows:

"Q. Have you got here, Mr. Murphy, the book— your inspection book—that you used that day? A. Yes, sir, I have. Q. Let's see, I believe you said the date was the 16th of April, 1904? A. 16th of April or March. Q. The 16th of April was the date of this accident? A. Here is the record of that train coming in on that day. Q. This book—this little memorandum that you have handed me—you say this was the book that you used in making your inspection as you went along the train? A. Yes, sir; that is the book. Q. Now, where did you put the number of the caboose that was on the train? A. Well, if it was not sent to the shop, I would put it up in the top corner—in the upper left-hand corner of the book. Q. Now, if there was anything wrong about the caboose, 531, that developed on inspection, how did you indicate it on this book? A. It would be put down here in this column, and a circle around the number, and over here on this

page you would put what was found or what was defective about it, opposite the number, all on this side of the page. Q. Were you working there, Mr. Murphy, in April, before the 16th, as inspector? A. Yes, sir. Q. Now, I wish you would look—I wish you would state first whether or not you have examined the memorandum books of the inspection, as you took it at the time, for the purpose of refreshing your recollection so as to tell whether or not, from the first of March, 1904, you found on inspection of that caboose, 531, any defect in connection with the handrails or this upright—what do you call it? A. Railing post. You say you want me to state if I have looked up these books and refreshed my memory. Q. Yes, sir. A. Well, I glanced over them, yes, sir, for about a month, along about that time previous to this. I have looked over my books, yes, sir, some little. Q. Do you find that there was any defect with the rail or upright post? A. No defect of that nature whatever.''

The authorities all hold that a liberal cross-examination of an adverse or unfriendly witness is permissible, for the purpose of ascertaining his feelings or bias against the party against whom he is testifying, or for testing his memory respecting the facts to which he testifies, although this is not allowable on direct examination. This cross-examination of witness Murphy was for the purpose of testing his memory and the accuracy of his memoranda as to the condition of the caboose on April 16, 1904, and the court in an instruction told the jury that it should not be considered for any other purpose. The witness had given very important testimony against Pangle, predicated upon the record which he testified he had kept, and upon the plainest principle of justice as well as by the rules of evidence it was permissible to test the accuracy of his memoranda. If this car was sent to the repair shop after the accident, and his record, which he testified would show it, did not do so, it

would certainly tend strongly to show the jury that he was mistaken when he stated that his record before the accident showed any and all defects found by him on his inspection of the car. On cross-examination, this witness testified that his record showed that the caboose was in the same condition on the 18th day of April as on the 16th of April, when he inspected it. He then testified that the 18th was the last day that his record showed any inspection of this car. He further testified that the car was sent to the repair shop some time after the day of the injury, but that his record did not show it, and he could not tell when.

In Bank v. Richards, 119 Mo. App. 1. c. 24, it is said: "Great liberality should be allowed in the cross-examination of an adverse party, where, as in this case, his evidence is a flat and unequivocal contradiction of the evidence of the opposite party in respect to the principal issue in the case. His conscience may be searched as with a lighted candle, and so long as his cross-examination is confined to the purpose of eliciting the truth relative to the issues in the case, a free hand should be given." So in the case of Mefford v. Railroad, 121 Mo. App. 647, it is said: "The cross-examination of the witness was largely in the discretion of the trial court." The same rule is announced in State v. Boyd, 178 Mo. 2; State v. Nelson, 101 Mo. 464; State v. Smith, 190 Mo. 706. Indeed the authorities are all one way upon this question, none of those cited by the defendant being to the contrary as we understand them.

Defendant also claims that the court erred in the admission of the statement made by C. H. Manker, the yard foreman, to Mary J. Pangle, mother of the injured man, about an hour after the injury occurred. With reference to the injury to her son, she asked Manker how it happened, and he said, "Harry took hold of that old loose handrail of the caboose, and fell. I have been trying to get them to put that caboose in

the shops for a month, and I guess they will put it in now." It appears from the record that this testimony was not offered in chief, or for the purpose of proving negligence on the part of the railroad company, but for the sole purpose of contradicting witness Manker on a material matter upon which he had testified for the defendant.

It is well settled that the statements or admissions of an employee of a railway company with reference to a past event, upon which he was not authorized to speak for his employer, are not admissible in evidence, as not being part of the *res gestae.* [Koenig v. Union Depot Ry. Co., 173 Mo. 698, and authorities cited.] But that rule has no application here, where the object of the testimony was the impeachment of a witness. Manker had testified for the defendant that about an hour and a half after the accident he examined the handrails on this caboose, that he found them in good condition and that they were not loose or shaky. This testimony tended to prove that the handrails were in good condition at the time of the accident, and it was, of course, offered for that and no other purpose. For the purpose of impeaching this witness he was asked, on cross-examination, if he did not, while at the house of Harry B. Pangle, on the 16th of April, 1904, shortly after the accident, make the statement quoted above to Mrs. Pangle. He denied having done so. Thereupon Mrs. Pangle was called, and being asked if Manker did not make said statement to her, at the time and place mentioned, she answered that he did. According to the testimony, this statement by witness Manker was made to Mrs. Pangle about an hour after the injury occurred, or half an hour before the time Manker, as he testified, examined the handrails and found them in good condition.

Defendant, however, argues that the witness had not seen the handrail at the time he was supposed to have made the statement to Mrs. Pangle, and that if made, it must have been upon mere hearsay. In answer to this, it need only be said that the record does not show that he told Mrs. Pangle that his statement as to the condition of the handrail was based upon anything that he had heard, but that he made it as if of his own personal knowledge and as a fact.

As we have already intimated, this narration by Manker to Mrs. Pangle of a past event and the conditions causing the injury, not being part of the *res gestae,* would not be admissible in evidence against the defendant, and the only question is, was it admissible for the purpose of contradicting or impeaching witness Manker?

In Spohn v. Railroad, 101 Mo. 417, it was held "that an agent who testifies to facts material to the issue may be contradicted by evidence of statements and declarations made by him inconsistent with his testimony, notwithstanding such inconsistent statements were made after the accident in issue and as a mere narrative of it." The court further said: "But where such statements or declarations relate to facts material to the issue on trial concerning which the agent has testified, he may be contradicted by evidence of them, the same as any other witness, the proper foundation having been first laid for introducing them."

In the case of Hamilton v. Mining Co., 108 Mo. 365, it was held "that where the defendant's superintendent on being examined as a witness for defendant, testified that he never gave the plaintiff the order to couple cars, he may on cross-examination, for the purpose of laying foundation for impeaching his testimony, be asked whether he had not after the accident stated to plaintiff that he gave the order."

In Kenner v. Railroad, 69 Mo. App. 312, the court said: ''The conductor testified that the cow came upon the track from behind a pile of cordwood, and when she came upon it she was so near the engine that it was impossible to prevent the collision. He was asked on cross-examination if he had not stated that the killing of the cow was 'a piece of carelessness on the part of the engineer.' The time, place and persons to whom the statement was alleged to have been made were embodied in the question. The objection to the question is without merit. It was asked with a view of contradicting the previous testimony of the witness, which is a matter of common practice.''

Witness Manker had testified to facts material to the issue, and there was, we think, no error in admitting evidence of a statement made by him inconsistent with his said testimony, the proper foundation for the introduction of such evidence having first been laid.

It is insisted by defendant that Pangle was guilty of negligence as a matter of law, and that the court, therefore, committed error in allowing the case to go to the jury. Pangle's negligence, as defendant states, consisted in his attempting to uncouple the car while the train was in motion, and in attempting to board the car at the front end instead of at the rear end, the latter being the safer and better way of getting on the car.

The train in question was what was called a ''hurry-up'' train, many of the cars being loaded with perishable fruit, and the yard foreman, Manker, was in a hurry to get it out, and so advised Pangle, who was working under his immediate direction. Manker had directed him to go down to the south end of the yards and meet this in-coming train, send it up the main line, and cut off the caboose and clear the switch, and then to attach the other caboose to the train. At the time Mr. Manker gave those directions, he also said

to Pangle, "This is a fruit train, and we want to get it out of here in a hurry." Pangle, obedient to the order, met the train, signaled it up the main line as directed, and when the caboose came along opposite to him, the train being then moving at a speed of about four miles an hour, he took hold of this handrail on the caboose and attempted to get on the steps of the car, and was injured in the manner described. The testimony showed that it was the custom in the defendant's yards at Pittsburg for its switchmen and employees to board moving trains in switching, coupling and handling the cars. Upon this subject Pangle testified as a witness in his own behalf as follows: "Well, they were both coupled standing still and in motion. In switching a train we never stopped the train to couple on a car, for if we did we never get a train switched. We had to switch a train to keep the cars moving. Q. State what rate of speed was the custom, if there was such there—at what rate of speed were cars going, and cabooses going, when men were operating them and doing work on them? A. Six, eight and ten miles, and as high as twelve miles an hour. Q. Was that the custom in the yards of the defendant at Pittsburg, Kansas, during all the time you worked there? A. It was the custom all the time I worked."

In the case of Brady v. Railroad, 206 Mo. 509, the plaintiff therein testified: "It is customary in the C. & A. yards, and in every yard, to go in on the brake beam to cut off cars where the lever don't work. Ruggles, the general yard master, was often down there while the men were going in between moving cars to cut them off." The plaintiff in that case was a switchman, and went in between the cars for the purpose of making a coupling, while the train was moving at a speed of five miles an hour, and was injured. The court held that the question of whether

the plaintiff, under the circumstances, was guilty of contributory negligence was for the jury.

In Brunke v. Telephone Co., 115 Mo. App. 36, it was held that "evidence of a custom in doing a certain thing has probative force bearing upon negligence, since custom arises from its adoption by many prudent men, and the law recognizes the value of arriving at the nature or tendency of the given act by considering its effect upon the conduct of others as shown by a general custom;" citing O'Mellia v. Railroad, 115 Mo. 205; White v. Railroad, 84 Mo. App. 411, and other Missouri cases.

When we consider the custom which prevailed in the defendant's yards at Pittsburg in the matter of coupling and handling cars while in motion, as also the directions given Pangle by the yard foreman in connection with this "hurry-up" train, and which he was endeavoring to carry out, we are unable to see wherein he was guilty of contributory negligence as a matter of law. Indeed, in our view there was scarcely sufficient evidence of contributory negligence in his conduct to entitle the defendant to have the question submitted to the jury.

The defendant further insists that Pangle should have gone to the rear end of the caboose to have gotten on, this being the safer way. Pangle states in his testimony that the cabooses were generally locked as they came into the station, but that he did not know whether this caboose was locked at the time. He further stated that he did not have time to get on the rear end, go through the caboose, and uncouple it before the train reached the switch. The service which Pangle was called upon to render was to be performed on the front end of the car, at which end he attempted to board it. There was nothing in the conduct of the plaintiff which would justify our holding that he was guilty of contributory negligence as a matter of law. At most, it was only a question for the

jury. [Edington v. Railroad, 204 Mo. 61; Charlton
v. Railroad, 200 Mo. 413; Murphy v. Railroad, 115
Mo. 111; Brady v. Railroad, supra.]

Nor was Pangle guilty of contributory negligence
in not uncoupling the car by means of the lever at the
side of the car, as it was necessary for him to get on
the platform of the car in order to put on the brake
and stop it, which he was required to do under the
directions of the yard foreman.

The point is made that the court erroneously per-
mitted plaintiff's counsel, upon the cross-examination
of witness A. F. Marsh, to show that the latter had
been discharged by the defendant for drunkenness.
This witness was conductor of the freight train in
question, and was afterwards discharged for the rea-
son stated, and at the time he was testifying against
the plaintiff he had an application in with the defend-
ant company for reinstatement. The question as to
his having been discharged for being drunk was not
asked for the purpose of establishing the fact of his
having been drunk, but as incidental to the more im-
portant questions of his discharge and his applica-
tion for reinstatement. This witness had given very
strong testimony against the plaintiff, and it was not
improper, for the purpose of affecting his credibility
as a witness, to bring out any facts on cross-examina-
tion which tended to show any bias in favor of the
party whose witness he was or his interest, if any, in
the suit. "The fact that a witness manifests a bias
or partiality for the party who calls him is a proper
matter for the consideration of the jury in estimating
the value of his testimony, and it is a general rule
that on cross-examination any fact may be elicited
which tends to show such bias or partiality." [30
Am. and Eng. Ency. Law (2 Ed.), p. 1088, and author-
ities cited.]

We concede that evidence showing that a witness
was drunk at a certain time, or was in the habit of get-

ting drunk, would, for the purpose of impeaching him, be inadmissible as the authorities called to our attention by the defendant abundantly show. This witness had been discharged from a responsible position, and the inquiry as to the cause naturally followed. His answer to such question could in no way affect his credibility as a witness or have any tendency to show a bias in favor of the defendant, and the question was only as a preliminary to the more important question as to his relations with the defendant and his having an application in with the company for reinstatement at the time he was testifying. In any event, we do not think the judgment should be reversed simply on account of the cross-examination of this witness, the admissibility of whose evidence was largely in the discretion of the trial court, and which we think was non-prejudicial.

It is also contended by defendant that the court erred in not dismissing the jury after the statement made by juror Lovelace, one of the regular panel. On being examined as to his qualifications as a juror, he stated in effect that he had read about the case in the newspapers, and thought at the time he read it that the plaintiff ought to have damages, but that the matter passed out of his mind after reading about it and he had thought no more about it. Mr. Lovelace was excused from service on the jury that tried the case; but the defendant insists that the court should have dismissed the entire panel. It is unnecessary to say more with respect to this contention than that there is no merit in it.

There are some other alleged errors of a like character with the preceding one which defendant complains of, and being without merit, we will not discuss them.

The final contention is that the verdict is excessive, and the result of passion and prejudice. That the verdict was a large one is manifest; but the in-

juries sustained by the plaintiff were dreadful, and rarely if ever surpassed in point of severity, and his suffering during his life thereafter was intense—worse than death. Prior to his injury he was an able-bodied young man, twenty-nine years of age, with several years' experience in railroad service, and earning about ninety dollars per month. His back and five of his ribs were broken, his pelvis and hip bones mashed, and he was bruised in his entire body. His injuries resulted in total paralysis from the middle of his back down, so that he had no control whatever of that portion of his body. He could not sit up without being propped with pillows or something to hold his body in position, nor did he have any control of the functions of his body.

Personal injury cases as a rule furnish no guide as to the amount of damages an injured party is entitled to receive in a case of this kind. The jury rendered a verdict in favor of plaintiff assessing his damages at fifty thousand dollars. Of this verdict the trial court required a remittitur of fifteen thousand dollars, and entered up judgment in favor of plaintiff for thirty-five thousand dollars. That court had a better appreciation of the facts as developed at the trial than we can have, and was better qualified to judge as to the size and fairness of the verdict. The court ordered the remittitur and overruled the motion for a new trial, and, under the circumstances, we are not disposed to interfere.

In the recent case of Partello v. Missouri Pacific Ry. Co., 217 Mo. 645, for damages for personal injuries, plaintiff recovered a verdict for $30,000, and judgment was entered accordingly. Afterwards on a motion for a new trial, plaintiff remitted $10,000, and the court let stand the judgment for $20,000. Upon appeal to this court, the judgment was reversed and the cause remanded on the ground that the verdict was excessive and the result of passion and prejudice.

But there was no comparison between the injuries in the two cases, those received by the plaintiff in this case being far more severe than those sustained by the plaintiff in the other case.

The judgment is affirmed. All concur.

## ON REHEARING.

PER CURIAM.—Upon motion for rehearing it is considered and adjudged that the opinion and judgment herein rendered on May 18, 1909, be and the same is hereby modified so that the said judgment shall be affirmed for the sum of twenty-five thousand dollars as of the date of the rendition of said verdict and judgment, and to bear interest from that date, if plaintiff shall within ten days from this date remit the further sum of ten thousand dollars as of the date of the said verdict, otherwise said judgment shall be reversed and remanded for new trial.