JOSEPH P. VARAS, RESPONDENT, v. JAMES STEWART AND COMPANY, INC., A. CORPORATION, AND WILLIAM LAYES, APPELLANTS.*—17 S. W. (2d) 651.

St Louis Court of Appeals.   Opinion filed June 4, 1929.

386

*Corpus Juris-Cyc References: Agency, 2CJ, section 544, n. 866, n. 95; Evidence, 22CJ, section 478, p. 402, n. 10; Master and Servant, 39CJ, section 1512, p. 1311, n. 48, 50; Negligence, 45CJ, section 324, p. 886, n. 61.

*O'Neill Ryan* and *Case, Voyles & Stemmler* for appellants.

*Foristel, Mudd, Blair & Habenicht* for respondent.

SUTTON, C.—This is an action for personal injuries. The trial, with a jury, resulted in a verdict and judgment in favor of plaintiff for $5500, and the defendants appeal.

Defendants complain here of the refusal of their several instructions in the nature of demurrers to the evidence.

At the time of his injury, plaintiff owned and operated an automobile repair shop at Sarah street and Easton avenue, in the city of St. Louis. He was a skilled and experienced mechanician. Defendant James Stewart and Company was engaged in the construction business. It owned and operated in its business a Ford motor truck. The defendant William Layes was an employee of defendant Stewart and Company, and as such employee was the driver of the truck. Between nine and ten o'clock, on the morning of May 6, 1923, Layes, by direction of his foreman, delivered the truck to the plaintiff at his repair shop to have some repairs made on the brakes. He was commissioned by his foreman to deliver the truck to plaintiff and to inform plaintiff as to the repairs to be made on the brakes. He had no other authority in the matter so far as the evidence shows. He was not a skilled or experienced mechanician. He had no special or expert knowledge as to the mechanical construction of the truck or its motor. His duties as an employee of defendant Stewart and Company were merely to drive the truck as directed by his foreman. There was no automatic starter on the truck, and it had to be cranked by hand. Layes delivered the truck to plaintiff in front of his shop on Sarah street, on May 6, 1923. About four or five o'clock on that day, plaintiff cranked the truck, and drove it inside the shop. After completing the repairs on the brakes the following morning, plaintiff undertook to run the truck out of the shop in order to test the brakes. He cranked the motor, and backed the truck out into the alley. It was a cold morning, and the motor died. Plaintiff then undertook to crank the motor again, and while he was so engaged the motor reversed or kicked, and the crank struck the plaintiff's arm, and broke it. It is for this injury that the plaintiff sues.

Plaintiff testified that several times previous to the occasion on which he was injured, defendant Layes had brought the truck to his shop for repairs; that the repairs were made as requested, and that defendant Stewart and Company paid for same; that when Layes brought the truck to his shop and directed him to repair the brakes, he asked Layes if there was anything else the matter with the truck, and that Layes said "No."

Plaintiff further testified:

"I was in business at Sarah street and Easton avenue for about three years, doing a general automobile repair business, repairing all makes of automobiles, but principally Fords. When I cranked the truck on the evening of May 6th, nothing untoward or unusual happened. In cranking it I first retarded the spark all the way up as far as it would go, and gave it gas, and then gave the crank two or three quarter turns. I didn't have any trouble with it that time.

Pulling the spark lever down advances the spark. If the spark lever is pulled all the way down, or a considerable distance down, in other words, when the spark is advanced, the motor will kick no matter what its condition is. Several days after I was injured I examined the motor of the truck in the presence of Layes. I found a bare commutator wire. The insulation was worn off. The bare wire was against the motor block. I said to Layes, 'Now, do you see that?' and he said, 'Yes, that is what makes the thing kick.' A bare place on any of the wires of the ignition system will cause a short, if the bare place comes in contact with the metal portion of the block, and if there is a short, it is bound to cause a kick back. At no time after I was injured did I inspect all the wiring of the ignition system of this Ford, and I don't know anything about the condition of the commutator wires or the ignition system except as to the condition of this one particular wire, which I have spoken about. After the engine of a Ford gets started it will run better with the spark advanced. It is best to keep it retarded until the motor gets warm. Whenever there is a short any place in the ignition system, a Ford will backfire, and after the motor gets started it will not run properly. If there is a short in a Ford, it is always very evident when the motor is running, and there is no trouble at all to tell whether there is a short in the ignition system. This Ford ran properly when I brought it from the street into my place, and it also ran properly when I was backing it on the following day between 9 and 9:30 in the morning, after I had put the brake bands in. There was not any short there then. If there had been I would have noticed it in a hurry. The bare wires move up and down slightly with the movement of the spark lever. If it went down so that the bare place came in contact with the metal portion of the block, it would cause a short. When I cranked the truck preparatory to taking it out of the shop, I had the spark lever retarded as far as it would go, and the motor did not kick at all. When I tried to crank it the second time and when I was hurt, I had the spark lever retarded as far as it would go, in exactly the same position it was in when I cranked it the first time.''

Plaintiff produced witnesses who testified that when Layes returned to the plaintiff's shop about a half hour after plaintiff was hurt, he made statements to the effect that the truck had a habit of kicking. One of these witnesses, an employee of plaintiff, testified, also, that he was present when Layes brought the truck to plaintiff's shop; that he heard Layes give directions to plaintiff to repair the brakes; that plaintiff asked Layes, ''Well, is that all that is the matter with it?'' and that Layes said, ''Yes.'' This witness also testified that he examined the truck about ten minutes after plaintiff was

injured, and discovered that one of the commutator wires was bare.

Defendant Layes testified:

"I started to work for Stewart and Company in about 1922, about the first part of the year. I started driving the truck, which has been mentioned, either in January or February, 1923, about four or five months before the accident. I brought it to plaintiff's place of business on May 6, 1923. I told plaintiff the truck needed brake bands. He asked me if there was anything else, and I told him 'No.' Mr. Langford was my foreman from the time I started driving the truck, and was still my foreman at the time plaintiff was injured. He was the only foreman that I had during the period of time, and I got all my instructions from him. He told me to take the truck to plaintiff's shop for repairs. This was the first time that I had any repairs done on the truck at plaintiff's shop. I did not know anything about an uninsulated commutator wire on that truck when I drove it to plaintiff's shop. I had been operating the truck daily before that time. At times the truck would kick if I wouldn't have my spark set. If the spark would be advanced too far she would kick on me. I am not a Ford mechanic or an expert on ignition. About all I know about a Ford is how to run it and how to touch an occasional spark plug. In May, 1923, I was not familiar with the construction of the ignition system of the Ford automobile. Whenever anything was wrong the trucks were sent to the shop. My only duties were to drive that truck. In connection with my duties I would crank that truck thirty or forty times a day, depending on what my work was and how long my haul was. My work consisted of hauling rubbish and building material from one place to the other. That was all done under the authority and instructions of Mr. Langford, and no one except Mr. Langford told me what to do. I never had any repairs made on that truck before getting verbal instruction from my foreman. When I went for the truck the next day, there were two gentlemen at the shop, but I cannot remember who they were. They told me about the plaintiff getting hurt, and I said: 'I am sorry to hear he got hurt. Maybe he had his spark advanced too far.' I did not know there was anything wrong with that truck, and I never told any one that I knew there was anything wrong with it. I had a conversation with plaintiff a few days after he was hurt. It was after quitting time in the evening. He asked to see the truck. I took him back and showed him the truck. He lifted up the hood, and looked around at the wiring. He did not point out any defective wire at that time. He never pointed out any defective wire to me at any time, and I never inferred to him that there was a defective condition there."

It is conceded that plaintiff was engaged in an independent business, and did the work on the truck as an independent contractor, and not as a servant.

It will be observed that there is an utter failure to show any knowledge on the part of the defendant Stewart and Company of the defective condition of the commutator wire, and this the plaintiff seems to concede. Plaintiff contends, however, that it was the duty of defendant Stewart and Company to know of this condition if it could have been discovered by reasonable care and diligence. In other words plaintiff contends that Stewart and Company owed the plaintiff the duty of inspection to discover the defect. To support this contention, plaintiff cites numerous authorities, which, we think, are inapplicable to the case made here. The law of this case is declared by the Kansas City Court of Appeals, in King v. National Oil Co., 81 Mo. App. 155, as follows:

"The plaintiff's evidence tends to prove that at the time the defendant sent its wagons to the firm to be repaired, the tanks thereon contained considerable quantities of vaporized gasoline, which, if brought in contact with hot metal or fire, would explode. If the defendant knew of the dangerous condition of the tanks at the time it sent the same to the firm for repairs, then there arose a duty on the part of the defendant to notify the plaintiff of the same so that he might take the proper precautions against the danger of injury incident to making the required repairs thereon. . . . If the defendant sent its wagon to shop of the firm for repairs, when it knew that the tanks thereon were charged with vaporized gasoline, then it must have reasonably anticipated the danger of an explosion if, in making such repairs, hot rivets should be used; and especially so since there is some evidence tending to show that the defendant's superintendent suggested to the firm that in making the repairs that it use hot rivets. . . . But the evidence of the plaintiff does not tend to show directly or inferentially that the defendant, at the time it sent the tanks to the firm, knew the same contained vaporized gasoline in a quantity sufficient to make it unsafe or dangerous to repair the same with hot rivets. Evidence of this fact was wholly wanting, and for this reason the defendant's demurrer should have been sustained by the trial court."

Cases of bailment for hire, relied on by plaintiff, are manifestly not in point here. In such cases the bailor's liability for personal injuries due to a defective condition of the chattel bailed, depends on whether the bailor knew of the defect, or, if not, whether it was discoverable by him through the exercise of due care. It is said that, while a bailor of personal property for hire is not an insurer against injuries from defects therein, whether discoverable or not, he is held to a high degree of care to make an examination of the chattel before letting it, and has frequently been regarded under the circumstances shown as impliedly warranting that it is fit for the pur-

pose known to be intended, so that for personal injuries which result on account of a breach of such warranty he may be held liable.

In Horne v. Meakin, 115 Mass. 326, which was an action for an injury due to the running away of a horse hired from the defendants who were liverymen, the trial court ruled that whether the defendants knew that the horse was unsuitable was immaterial. In sustaining this ruling, on appeal, the court said:

"It was the duty of the defendants to furnish a suitable horse for the purpose for which it was hired, and a part of their contract that they would do so. If they have negligently furnished one which was unsuitable, and injury has been occasioned thereby, it is not a defense that they did not know that the horse was unsuitable."

The rule of implied warranty of fitness has been applied with respect to contracts of hiring of carriages or harness, although it does not appear that this is an absolute warranty, but rather an undertaking that due care has been taken to make an examination, and that there are no defects which such an examination will disclose.

In Denver Omnibus & Cab Co. v. Madigan, 21 Colo. App. 131, which was an action for damages due to the breaking of the axle of a buggy, hired by the plaintiff from defendant, a liveryman, while the buggy was being driven along a level street, and an examination made after the accident showed that there was an old break in the axle extending half through it, it was held that it was for the jury to determine whether or not such defect was known to the defendant, or could have been known to him by the exercise of that care and diligence required by the law.

In Copeland v. Draper, 157 Mass. 558, it was held that the keeper of a livery stable does not, by letting a horse, warrant it to be free from defects of which he has no knowledge, and which he could not have discovered by the exercise of due care, so as to render himself liable for an injury to the person to whom the horse was hired, caused by such defect.

In Stanley v. Steele, 77 Conn. 688, it was held that whether or not a livery-stable keeper was liable to a patron for an injury due to the defect in a neckyoke of a carriage furnished by him depended upon whether or not the defect was discoverable by the exercise of such care as is usually exercised by persons of ordinary prudence in the conduct of such business.

These cases, relating to bailments for hire, furnish a well-nigh perfect antithesis to the case at bar. It is easy to see why a livery-stable keeper, engaged in the business of hiring instrumentalities for the use of the persons to whom they are hired, impliedly warrants the suitability of such instrumentalities for the purposes for which they are hired, and their freedom from defects which may endanger the bailee in their use, so far as such defects may be discoverable

by the exercise of due care. One engaged in such business owes to his patrons the duty of reasonable inspection. This duty arises out of the very nature of his undertaking. But is the owner of an automobile, consisting of complicated and intricate machinery, concerning the construction of which he has no expert knowledge, who delivers it to a skilled machinist for repairs, to be placed in the same class with persons engaged in the business of hiring vehicles or other instrumentalities to their patrons to be used by them for transportation purposes? We are unwilling to so rule. The bailment of an automobile, to a skilled and experience repair man, to be repaired, is very different from the bailment of a vehicle for hire, for use by the bailee. The owner of an automobile delivering it to a repair man for repairs owes to him the duty to disclose to him any defect in the mechanism, which may render it unsafe or dangerous, of which such owner has knowledge, but does not owe to him the duty to employ the skill of an expert mechanician to make an examination to discover such defect before delivering the automobile for repairs. The evidence in the present case does not show or tend to show directly or inferentially that defendant Stewart and Company knew that the motor truck delivered to plaintiff was defective so as to render it unsafe or dangerous to plaintiff, if in fact it was so defective, or that said defendant was derelict in any duty it owed plaintiff under the law. There was no evidence, competent against defendant Stewart and Company, to show that the defective condition complained of existed for a sufficient length of time to afford an inference of knowledge on the part of said defendant. The plaintiff himself testified that he cranked the truck twice without difficulty, and there was no evidence in the case, competent against Stewart and Company, to show that the truck developed any kicking propensities, except when the spark was too far advanced, prior to the time it kicked and injured plaintiff. It is conceded that kicking, when the spark is too far advanced, is a habit characteristic of the species.

Many cases relating to the duty of the master in providing his servant with appliances with which to perform his work, are cited and relied on by plaintiff. It is obvious that these cases have no application here. The plaintiff was not the servant of Stewart and Company, but was an independent contractor. There is no parallel between the obligation of the master to his servant and the obligation of the owner of an automobile who delivers it for repairs to a skilled repair man engaged in such work as an independent business.

But plaintiff insists that the knowledge of defendant Layes, as a servant of Stewart and Company, as to the defective condition of the truck was knowledge on the part of Stewart and Company. Ordinarily, knowledge on the part of a ministerial servant, such as was Layes, is not imputed to the master. [2 C. J. 865.] But be this

as it may, there is no evidence in this case, competent against Stewart and Company, showing or tending to show that Layes knew of the defective condition of the truck. He testified that he had never known the truck to kick, except when the spark was too far advanced, and that he did not know of the uninsulated condition of the commutator wire. He testified that he knew nothing about the mechanism of the truck, and that all he knew was how to operate it. The only evidence relied on by plaintiff to show knowledge on the part of Layes is his declaration made a half hour after the plaintiff's injury, and another made several days afterwards. But these declarations of this mere ministerial servant, not being made as part of the *res gestae,* were clearly incompetent against defendant Stewart and Company. The admission of these declarations as evidence against said defendant was promptly objected to. Such declarations constituted no evidence as against said defendant. [Rice v. City of St. Louis, 165 Mo. 636, 65 S. W. 1002; Redmon v. Metropolitan Street Ry. Co., 185 Mo. 1, 84 S. W. 26; St. Charles Savings Bank v. Denker, 275 Mo. 607, 205 S. W. 208; Adams v. Hannibal & St. Joseph R. Co., 74 Mo. 653; Gordon v. Kansas City Southern R. Co., 222 Mo. 516, 1. c. 532, 121 S. W. 80.]

We are also of the opinion that the evidence fails to show liability on the part of defendant Layes. He was a mere ministerial servant, commissioned, as the driver of the truck, to deliver it to the plaintiff, and to deliver the instructions of his master to repair the brakes. He was not a foreman or manager, and had no general powers or authority. His failure to disclose to plaintiff the defective condition of the truck amounted to mere nonfeasance. It was neither malfeasance nor misfeasance. If the servant negligently performs what he undertakes to perform for his master, he is guilty of misfeasance, whether the negligence consists of an act of commission or a mere omission, in other words, whether the negligence is a positive wrong or a negative wrong. But, if, in performing the work the master has commissioned him to perform, he merely omits that which is not within his duties as servant, this amounts to mere nonfeasance, for which he is not liable.

In 20 R. C. L., at page 100, we find the following statement of the doctrine: "Of course, in case of malfeasance or misfeasance, the relationship to the master may be entirely immaterial, because the liability may be predicated on the positive wrong done, while in case of nonfeasance, the duty to the complaining party must be worked out, if at all, through the duty which the servant had undertaken to perform for the master."

Plaintiff cites and relies on Orcutt v. Century Building Co., 201 Mo. 424, 99 S. W. 1062, where the Mississippi Valley Trust Com-

pany was held liable as agent and trustee of the owner of a building, for personal injuries to a third person, a passenger on a freight elevator, caused by the negligent operation of the elevator or by defective elevator machinery. In that case, the contract of the trust company with the owner of the building placed the entire management of the building in the hands of the trust company. Not only that, but the purse strings of the owner were placed in its hands. The trust company, through its subagents, persons paid by it, employed the help. All repairs were paid for by it, and the wages of the servants were paid by it. In fact, it had full management and control of the building. It was under this state of facts that the court held the trust company liable, and announced and applied the doctrine that, where an agent undertakes to do for a person a particular work, and has actually entered upon the performance of that work, in doing it fails to respect the rights of third parties by doing some wrong, whether of omission or commission, as where he fails or neglects to use reasonable care and diligence in the performance of that work, he is guilty of misfeasance, and will be personally responsible to such third party who is injured by reason of such misfeasance. Obviously, that case is no authority for holding defendant Layes liable in the present case.

Plaintiff also cites and relies on McCarver v. St. Joseph Lead Co., 216 Mo. App. 370, 268 S. W. 687, where the superintendent of a mine negligently ordered a miner to work under an unsafe roof, when by making a reasonable and careful inspection, he could have discovered that a large slab was loose and likely to fall. His negligence was held to be misfeasance, and not nonfeasance. That case is clearly distinguishable from the instant case. The superintendent, as such, was in full charge and control of the work. He stood in the stead of the master. It was his duty as superintendent to exercise due care for the safety of the servant working under him, as much so as though he were himself the master.

The last word of our Supreme Court en Banc on this troublesome doctrine is found in State ex rel. Hancock v. Falkenhainer, 316 Mo. 651, 291 S. W. 466, wherein the master's foreman was held jointly liable with the master for negligence in starting a machine in motion without warning the servant of his intention to do so, whereby the servant was injured. In that case the court, speaking through Judge GANTT, said:

"Respondents insist that the failure of defendant Carlson to warn plaintiff before starting the machine in motion was an act of omission, and necessarily an act of nonfeasance. We have ruled differently. In the case of Orcutt v. Century Electric Co. et al., 201 Mo. 424, l. c. 446, 99 S. W. 1062, we held, in an opinion by GRAVES, J., that when an agent entered upon the performance of the work

any act which he did, whether by omission or commission, was misfeasance, and he was jointly liable.''

That case is typical of the cases which hold an omission of the servant to be a misfeasance. Manifestly, the failure of the foreman to warn the servant under his supervision of his intention to start the machinery in motion was a negligent performance of what he undertook to do for the master as foreman. There is no such state of facts in the present case. Defendant Layes was not a foreman or manager, but a mere ministerial servant commissioned to perform a particular act as directed by his master. There was no privity of contract between him and the plaintiff. He committed no positive wrong. His liability to plaintiff, if any, for failure to notify him of the defective condition of the truck, must arise out of the duty which he had undertaken to perform for his master. No duty to notify plaintiff of such defective condition was imposed upon Layes in performing the ministerial act of delivering the truck with his master's message to the plaintiff.

We are not persuaded that a mere ministerial servant engaged to drive a motor truck as directed by the master must notify a repair man, to whom he delivers the truck to be repaired, of any defective condition of which he may happen to have knowledge, that may perchance cause injury to the repair man, or be required to respond in damages for failure to do so. For such mere nonfeasance the servant is not liable.

Plaintiff contends, however, that Layes expressly misrepresented to plaintiff the condition of the truck, and thereby committed a positive wrong. We cannot so interpret the evidence. It is obvious that the plaintiff in making inquiry of Layes as to the condition of the truck was not seeking to elicit information with respect to whether or not its condition was such as to endanger him in his work, but was merely seeking to know whether there were other repairs for him to make, and that Layes made answer accordingly.

The Commissioner recommends that the judgment of the circuit court be reversed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly reversed. *Becker* and *Nipper, JJ.,* concur; *Haid, P. J.,* not sitting.