# GEORGIA HOHIMER, Respondent, v. CITY LIGHT AND TRACTION COMPANY, Appellant.*

Kansas City Court of Appeals. May 26, 1924.

1. **ELECTRICITY**: Degree of Care: Highest Degree of Care Required in Transporting Electricity Upon and Over Streets. A company transporting electricity about streets must use every precaution accessible, and exercise the highest degree of care in the maintenance of its wires, and must be vigilant to discover and remedy any defect which may permit the escape of such deadly agency from such wires whereby it can come in contact with persons rightfully using such streets.

2. ——: Negligence: To Render Electric Company Liable Injury Should Have Been Reasonably Anticipated. To charge an electric company with liability for injury to one coming in contact with its wires it is necessary that the injury be one which a person of ordinary prudence, in the light of the surrounding circumstances, would reasonably and naturally have anticipated.

3. ——: ——: Proximate Cause: Negligence Complained of Must be Proximate Cause of Injury. Mere negligence in the maintenance of an unsafe wire is not alone sufficient to charge an electric company with liability for injury, but the negligence complained of must be the proximate cause of the injury.

4. ——: ——: ——: Liability for Injury May Arise from Concurrent Negligence. Negligence does not have to constitute the sole cause of an injury; if it concurs with the negligence of another, not the plaintiff, and becomes a part of the direct and proximate cause, though not the sole cause, liability will nevertheless arise.

5. ——: ——: To Establish Liability Particular Injury Need Not be Foreseen. To establish liability for injury that should have been reasonably anticipated does not mean that the precise and particular injury complained of must be foreseen.

6. ——: ——: Evidence Held Sufficient as Against Demurrer. In an action for injury resulting from an electric shock received through the alleged negligence of defendant in permitting electric current to escape from its wires to telephone wires in proximity thereto, evidence *held* sufficient to justify overruling demurrer thereto..

7. **INSTRUCTION**: Instruction Held Not to be Erroneous as Directing Verdict. In an action for injury received from an electric shock, an instruction submitting that it was the duty of defendant to insulate its wires and to use a very high degree of care to keep the insulation in such condition as to make the wires reasonably safe, and failure to exercise such care would constitute negligence, was not erroneous as directing a verdict.

---

*Headnotes 1. Electricity, 20 C. J., Sections 36, 43; 2. Electricity, 20 C. J., Section 36; 3. Electricity, 20 C. J., Section 52; 4. Electricity, 20 C. J., Section 50; 5. Negligence, 29 Cyc., p. 495; 6. Electricity, 20 C. J., Section 67; 7. Trial, 38 Cyc., p. 1652.

Appeal from the Circuit Court of Pettis County.—*Hon. Dimmitt Hoffman*, Judge.

AFFIRMED.

*Montgomery & Rucker* for respondent.

*George F. Longan* and *H. B. Shain* for appellant.

TRIMBLE, P. J.—Plaintiff's action is for damages resulting from an electric shock received through defendant's alleged negligence. Defendant owns and operates the electric light and power plant in Sedalia. Verdict and judgment for $2000 being obtained, the defendant has appealed.

Engineer street, running north and south, intersects Third street running east and west. For about twelve or fifteen years prior to the injury, defendant had maintained, along the *east* side of Engineer street, three parallel high voltage wires attached to cross-arms fastened, twenty-five feet above the ground, on poles set just inside the curb or outer edge of the sidewalk, one of said poles being at the northeast corner of said street intersection. The Southwestern Bell Telephone Company maintained a line of telephone wires along the *west* side of Engineer street, likewise fastened to cross-arms on poles similarly set in the sidewalk on that side of the

street, one of said poles being near the northwest corner of said street intersection but slightly northwest of the aforesaid electric light pole on the opposite corner. The Telephone Company also had a line of telephone wires running east and west along the north side of Third street, likewise attached to cross-arms on poles similarly set just inside the curb or outer edge of the sidewalk on that side of said street. The telephone wires along the west side of Engineer street were somewhat higher than the electric wires on the opposite or east side of the street, though the record does not disclose how much higher; and the telephone wires along the north side of Third street were somewhat lower than the aforesaid electric wires, though how much lower they were is not disclosed.

Some eighteen months prior to the injury, the telephone company braced the telephone pole near the northwest corner of said street intersection by running a "brace wire" therefrom, above and across the electric wires, to a "stub or brace" post, located 120 to 200 feet distant and which was set in line with the poles supporting the east and west telephone lines along the north side of Third street. Said stub post was only a few feet beyond the second telephone pole east of said street intersection, the first one being at or near the northwest corner of said street intersection.

From the top of defendant's electric pole at the northeast corner of said street intersection, the defendant had run its brace wire to the telephone company's said stub or brace post and attached it thereto at or very close to the point where the telephone company's above-mentioned brace was fastened. A few feet out from defendant's said electric pole there was, on defendant's brace wire, a "pull ball" insulator to break the electrical communication between said electric pole and the stub post and stop any current which might perchance get on said brace wire belonging to defendant.

From the upper part of the stub post, near the point where the telephone company's brace wire was fastened, the telephone company had a guy wire which, sloping east, ran down to the ground and was fastened to a "dead man" therein, set in line with the telephone poles on that side of Third street. At some point on this sloping guy wire, not clearly shown in the record but apparently high enough up to be beyond ordinary human reach, there was a "pull ball" insulator placed there by the telephone company as a break in any electrical connection between the top of said guy wire and the ground.

From the top of the above-mentioned second telephone pole, located a few feet west of the stub post, a guy wire ran down and was fastened to the stub post near the ground.

One of the telephone wires running east and west along the north side of Third street had broken and fallen to the ground but remained fastened to and suspended from the aforesaid second telephone pole near the stub post. We have searched the abstract of the record carefully to discover any showing as to where this break occurred, but found none. In its briefs and also in the oral argument defendant seems to have assumed that this break occurred between the first and the second poles, i. e., at some point *west* of the pole from which it hung suspended. However, both at the trial and in the oral argument before us, the defendant's huge model of the various wires and poles, concededly showing a correct representation of the entire situation at the scene in question, was used; and said model unquestionably shows that the wire broke somewhere between the second and third poles, that is, *east* of the second pole and presumably near the third pole. The difference in the location of the break apparently is this: The loose wire, when the injury occurred, was hanging from the second telephone pole and lay to the east past the stub post and across the guy wire running from the stub to the "dead man." Consequently, if the

break occurred between the second and third poles the wire would naturally fall down and pass close to the stub post and perhaps across its guy wire running to the "dead man," whereas, if the wire broke between the first and second poles, or west of the latter, it would lie in that direction, and before it could get in the position it apparently was in at the time of the injury, it would have had to be carried in some way around to the east and past the stub post and thrown over the guy wire running therefrom to the "dead man." However, even if it should be conceded that the wire broke between the first and third poles, we do not think the disposition to be made of the case would be materially affected owing to the fact that this swinging loose wire could easily get to the east even if the break occurred west of the pole from which it remained suspended.

Plaintiff's house and front yard, on the north side of Third street, fronted south thereon and was located a short distance east of the street intersection but close to the stub post and guy wire therefrom fastened to the "dead man." Opposite to, or north of this "dead man" was a tree located in the yard and a few feet back from the sidewalk.

Prior to the day of the injury, which was on the 24th of June, 1923, the broken telephone wire, either in falling (if the break occurred east of the second pole), or (if the break occurred, as defendant assumes, *west* of said pole), had, in some way, gotten around to the other side of said telephone pole, and was across the sloping guy wire leading from the stub post to the "dead man." The evidence shows that a neighbor had seen the wire and some children playing with it, and he had wrapped said wire around the tree hereinabove mentioned. The evidence also is that plaintiff herself, in passing, had seen the wire and had attempted to wrap it around a post "right at the side." Whether this was the telephone pole or the stub post may not be clear, but presumably she meant the stub post.

On the day of the injury, a family, living immediately adjoining plaintiff on the west, being compelled to be away from home, left their little boy James, eight years old, in plaintiff's care; and he and his brother, in company with plaintiff's little boy, were playing in the front yard and on the sidewalk.

About 10:30 in the morning, the brother and plaintiff's boy ran into the house and told plaintiff that "something had happened" to James. Plaintiff ran out in the yard and found James lying on the ground in the yard, but with his feet on the sidewalk, holding the telephone wire in both hands from which sparks were flying. Instinctively, she ran to him and cautiously caught hold of his body and tried to pull him back and received the shock for which she sues. The child was killed.

Plaintiff placed on the stand, defendant's Superintendent of Construction, who testified that the injury to the child resulted from the telephone company's "brace wire," above and across the 2300-volt, high power wires, coming in contract with the latter wires and wearing the insulation off; that no porcelain or other special insulation was used to prevent electrical connection being made at this point; and that the life of the insulation that comes with wires depends on "weather conditions and the general wear and tear." He didn't know when the wires were installed; that it was standard practice to use porcelain insulation "to insulate wires where passing trees and things that are liable to have an abrasive effect" but that such was used where there was a *fixed* object and not a swinging guy wire; that he didn't know of any practical means to insulate these wires though they did use some sort of wooden insulation where the conductors went through trees, and that they didn't use any insulation on the wires where they were liable to rub together, but the only proper way was to "sectionalize" the wires liable to make a contact, that is, by putting "strain insulators," made of porcelain, on the brace or guy wire on each side of the power wires so that the current, if

the wires did come in contact, would not reach the ground. He was asked if he made any effort to section-alize and guard this guy wire in that way, but, upon ob-jection of defendant, the court would not permit the question to be answered, apparently on the theory that the petition confined itself to the question of contact of the loose wire with the guy wire from the stub post down to the "dead man" and not the brace wire.

This witness further testified that his inspection men inspected the lines probably three times a year; that where there wasn't an "absolute clearance" be-tween wires he recognized the danger and instructed his men to immediately take precautions to keep the wires from coming in contact; that if, in the course of inspec-tion, any of his linemen found a telephone guy wire, or a wire of any kind belonging to anybody, coming in con-tact with one of the high power wires, it was recognized immediately as being dangerous; that in a span of wire stretched 120 feet there was a normal sag, depending upon the weight and character of construction, but or-dinarily amounting to eighteen inches or two feet. He presumed, but he didn't know, that at the last inspec-tion there was a clearance of at least two feet, else the men would have reported it. He admitted that if, for a period of two months prior to the injury, there had been sparks flying from the wires where they crossed each other, it would indicate that there was not a two-foot clearance at the last inspection; that although they had attached a guy wire from the electric pole at the corner to the telephone company's stub post, it was not the in-spection men's duty to inspect the telephone company's apparatus except to see that its (defendant's) guy wire was taut; and that they never paid any attention to the anchorage of the stub post as it belonged to the telephone company. The witness further testified that as a result of the telephone company's "brace wire" coming in contact with defendant's 2300-volt wire, the current was transmitted along the brace wire to the stub post and thence to the other wires around it and was in that way

transmitted to defendant's guy wire fastened to the telephone company's stub post at least as far back as the pull ball insulator thereon. The court, upon defendant's objection, would not allow plaintiff to ask whether, if the loose telephone wire had been over defendant's own guy wire the child, upon taking hold of same, would have been killed just the same. This refusal was on the theory that the petition had specified the passage of the deadly current as being over the telephone company's guy wire from the stub post to the "dead man" and not from contact of the telephone wire with the *defendant's* guy wire.

The petition stated the existence of the high voltage wires and the telephone brace or guy wire over and above the same to the stub post, and alleged that "a loose wire belonging to the . . . Telephone Company ran from where said guy wire was attached to said post to the ground in such manner that if said guy wire and said high voltage electric wire should come in contact with each other, it would charge said guy wire and the said loose wire running to the ground with a high voltage of electricity and make the same extremely dangerous to persons coming in contact therewith. That the said high voltage wire of the defendant . . . was negligently permitted to become uninsulated. That said guy wire was so near the said high voltage wire on said day and had been so near for a long time prior thereto, that the same would and could come in contact with each other, all of which the defendant knew or by the exercise of ordinary care should have known. And that every time they came into contact, the high voltage wire would charge the said guy wire and loose wire with a high voltage of electricity and render the same highly dangerous. . . . On said day said guy wire and electric wire did come into contact and the said loose wire thereby became charged with a high and dangerous voltage of electricity" etc.

It appears from the testimony of defendant's construction foreman, placed on the stand by defendant, that

the last inspection made prior to the injury was in November, 1922, and at that time he remembered that the clearance of these wires, out of a hundred or more in the city, was twenty inches, though there was nothing to attract his attention and he merely measured it by sight; that he knew if the wires touched, the insulation on the wires would be no protection whatever to prevent the passage of the current, and that in that event the current would pass to the stub post and to its guy wire, but he said he didn't see why that would create a dangerous situation, and he made no report to the company in reference to it.

There was evidence in plaintiff's behalf that for a period of perhaps two months prior to the injury, whenever the wind blew, sparks were emitted from the point where the telephone guy wire crossed the defendant's high voltage wires; also that for two or three months prior to the injury the loose telephone wire had been hanging down; that children for two or three months had been playing with said wire; that once a neighbor had wrapped it around the tree as heretofore stated, and that, on Monday before the Saturday on which the injury occurred, plaintiff had wrapped the wire around the pole as hereabove mentioned. Neither plaintiff nor the children on those occasions received any shock from said wire.

It is urged that the defendant's demurrer to the evidence should have been sustained. Stating defendant's position in our own language, it seems to be this:

That even if the telephone brace or guy wire crossing over defendant's high voltage wires came, or could come, in contact therewith, and thereby communicate a deadly current along the telephone guy wire to the stub post, nevertheless, a dangerous situation could not be anticipated to arise therefrom as there was an insulator in the guy wire running down from the stub post to the "dead man," which could be depended upon to prevent the current reaching the ground or coming close enough thereto to endanger anyone in that vicinity.

That under the allegations of plaintiff's petition and the evidence, the injury arose through the loose telephone wire, in some way getting east of the pole from which it was hanging and beyond the stub post and across the guy wire running down therefrom to the "dead man," and even then it would not have become dangerous had it not, in some way, either in the boys' play or otherwise, gotten across said guy wire at a point *above* the "pull ball" insulator thereon, and therefore this happening was an "intervening agency" which the defendant ought not to be required to anticipate and for which it should in no wise be held responsible.

The further contention seems to be made that the petition does not allege, and the evidence does not disclose, *when* the loose telephone wire got above the insulator on the guy wire or that it did so any length of time before the injury or was there for such a length of time before the injury as to give constructive notice to defendant that a dangerous situation had arisen.

A further contention seems to be that the petition does not allege negligence in the way which plaintiff's evidence attempts to show was the cause of the injury.

Without regard to the question whether, in this particular case, it is necessary for the petition to set forth the matters which defendant claims are fatally lacking therein, we may observe that no attack whatever was made on the petition in the trial court. And if the last contention above mentioned be interpreted to mean that the petition alleges negligence *solely* in allowing the high power wires to become *uninsulated,* whereas the evidence is that the wires by coming in *contact* wore the insulation away and contact was thereby made, we may say that not only may this be understood as the *way* defendant allowed the wires to become uninsulated, but also that the *facts* stated in the petition as to allowing the wires to come in *contact* with each other states negligence in that regard also; and the petition refers the injury to all the "aforesaid careless and negligent acts" of the defendant. The same may be said of the petition with re-

gard to the length of time the loose wire had been down and of defendant's notice thereof either actual or constructive. Without deciding whether, in this case, such was necessary to be alleged and proved, it is clear that the petition set up the proximity of the two wires crossing each other, and the existence of the loose wire; and it alleged that the proximity of the two wires had been such "for a long time prior thereto" (the date of the injury) that contact would be made, which the defendant knew or should have known, as well as that "every time they came into contact the higher voltage wire would charge the said guy wire and loose wire with a high voltage of electricity." Hence we think the petition implies, if it does not expressly state, that the time such condition existed applied, not only to the proximity and contact of the two wires, but to the loose wire as well. Consequently, even if it be necessary to allege the matters contended for by defendant, we think they are contained in the petition.

It is somewhat remarkable that the record nowhere discloses the precise position or location of the hanging loose telephone wire whereby it formed a connection for the current to reach the ground. But it does unquestionably and concededly show that the loose wire did make such connection, owing to the escape of the current from the high voltage wires along the telephone brace or guy wire to the stub post. The petition does not specifically allege or set forth the precise position of the loose wire further than to say that it "ran from where said guy wire was attached to said post (the stub) to the ground in such manner" that if contact was made by the guy wire with the voltage wires, the loose wire would be charged with a current of electricity dangerous to persons coming in contact therewith.

But defendant's model hereinabove referred to, and used in the oral argument, showed the loose hanging telephone wire lying across the guy wire from the stub post down to the "dead man" at a point above the ball insulator therein, and, as no objection was made thereto,

we shall assume it as conceded that such was the position of the loose wire at the time of the injury, especially as the petition says the loose wire "ran from where said guy wire was attached to said (stub) post to the ground," etc., and the model shows that the brace or guy wire across the high voltage wires, and the guy wire from the stub post to the "dead man" in the ground, were attached to the stub post at the same point. There is, therefore, no difference between the allegations of the petition and the evidence as to where the loose wire ran from. However, no contention is made that there is any variance in this regard. We only mention the matter as an additional reason for assuming that the loose wire was in some way across or in contact with either the guy wire from the telephone pole to the stub post or the guy wire from the stub post to the "dead man," and perhaps both, at the point where they were tied to the stub.

The contention that the demurrer to the evidence should have been sustained, overlooks or ignores the deadly nature of the agency defendant is handling and the consequent very high degree of care imposed upon defendant to prevent the escape of such deadly agency to the injury of those who, having a right to be where they are, become innocently exposed to its dangers. As said in an introductory note in 17 A. L. R. 833, "In view of the deadly character of high tension wires, and the impossibility of even an expert determining from observation whether a wire is harmless or deadly, the courts generally have required a very high degree of care in the placing and maintenance of such wires, in favor of the general public. . . . The circumstances under which injuries may occur are so varied that it is difficult to formulate a general rule which will govern liability in all cases, and the tendency of the courts has been, very largely, to decide each case on its own peculiar facts. The question of negligence of the electric company, proximate cause, . . . have entered into the discussion and run through all the various situations under which the accidents have occurred; but the place where the

accident occurred is the element which comes nearer to harmonizing the cases and furnishing the basis for a statement of a rule which can be regarded as the legal principle governing similar situations, than any other. Thus if the injury occurs in a street or other public place, the circumstances must be very peculiar to relieve the electric company of liability," etc.

Our own courts have repeatedly held, and it is therefore well established, that since electricity is "one of the most dangerous agencies ever discovered by human science," a company transporting it about the streets must "use every precaution" accessible, and exercise the "utmost care," or the "highest degree of care," in the maintenance of its wires, and must be "vigilant" to discover and remedy any defect which may permit the escape of such deadly agency from said wires whereby it can come in contact with persons rightfully using the thoroughfares or wherever they may have a right to be. [Geismann v. Missouri, etc., Electric Co., 173 Mo. 654, 674; Brubaker v. Kansas City Electric Light Co., 130 Mo. App. 439, 447; Hickman v. Union, etc., Power Co., 226 S. W. 570, 573; Von Trebra v. Laclede Gaslight Co., 209 Mo. 648, 659; Hill v. Union, etc., Power Co., 260 Mo. 43, 83.]

But, of course, to charge an electric company with liability for injury to one coming in contact with its wires, it is necessary that the injury be one which a person of ordinary prudence, in the light of the surrounding circumstances, would reasonably and naturally have anticipated. [Austin v. Public Service Co., 17 A. L. R. 795.] And mere negligence in the maintenance of an unsafe wire is not *alone* sufficient, but the negligence complained of must be the proximate cause of the injury. [Luehrmann v. Laclede Gaslight Co., 127 Mo. App. 213, 218.] On the other hand, the negligence does not have to constitute the *sole* cause; if it concurred with the negligence of another, not the plaintiff, and became a part of the direct and proximate cause, though not the

sole cause, liability will nevertheless arise. [Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 623.] And when it is said that the injury must be one that could have been reasonably anticipated, this does not mean that the precise and particular injury complained of must be foreseen. [Harrison v. Kansas City, etc., Co., 195 Mo. 606, 629.]

The telephone company's brace wire above, and coming in contact with, the high tension wires whereby sparks were emitted for a period of two months before the injury, is sufficient to show negligence in the part of the company to say nothing of the evidence from which the jury could find that during that time the defendant was negligent in not having either sufficient insulation or clearance to prevent the swinging 120-foot wire from sagging far enough to allow contact with the high voltage wires.

It was defendant's duty to exercise the highest degree of care to avoid the likelihood of the said wires coming in contact with each other and to prevent *escape* of the electric current from defendant's own wires. It could not allow such deadly agency to escape to the telephone wires and supinely trust to the telephone company seeing to it that such escaped current did not come near the ground and injure someone. Nor could the defendant, without culpability, allow a condition to exist whereby its current *might* escape. Although defendant could not depend on the telephone company taking care of such escaped current, yet, as a matter of fact, defendant took not the slightest precaution to see whether its current, if it did escape, would be held in bounds by the telephone company's precautions, since the only inspection made in reference to the stub post was to see whether the defendant's guy wire, attached to the telephone company's stub post, was taut. The telephone pole, only three or four feet from the stub post, had a loose telephone wire hanging therefrom for two months or more, and it had gotten east of the pole from which

it hung and across the sloping guy wire where children had been playing with it, so that a neighbor had tied it around the tree. Said wire evidently got loose therefrom for plaintiff herself, nearly a week before the injury, had attempted to get it out of the way by wrapping it about the pole or the stub post. Manifestly, it would seem that any man could reasonably apprehend that a deadly current of 2300 volts, escaping to the brace wire and from thence to the stub post, would be very likely to reach and charge wires on the telephone system with a deadly current (which telephone wires would not be expected to have), and thereby injure anyone who came in contact therewith. Certainly it could be readily apprehended that the deadly current would charge the swinging loose wire hanging from the pole so near the stub post. The "pull ball" insulator could not be depended upon in such case, since the hanging loose wire, the unstable sport and plaything of children or of its own elasticity, or of any other passing force, could easily pass above and over the insulator ball and thereby transform the seemingly harmless wire into a deadly serpent ready to fatally sting anyone who touched it. In fact, defendant's duty was to exercise the highest degree of care to prevent the escape of electricity from its *own* wires, and as stated, it could not rely upon any precautions of the telephone company to nullify defendant's own negligence. If its electricity was escaping from its wires, then defendant could anticipate that, in some way, it was likely to produce injury even though defendant might not be able to know the particular way in which injury could come about.

The case is not like that of Luehrmann v. Laclede Gaslight Co., 127 Mo. App. 213, 218, where an inch of insulation was off an overhead wire, and, *a few moments before the injury* complained of, some boys had thrown a baling wire over the electric wire and pushed it down to the uninsulated place thereby making an electric trap of a pool of water in which the ends of the baling wire

rested, and in which plaintiff and his horse was injured. There was no *escape* of electricity until the boys caused it.

In Harrison v. Kansas City Electric Light Co., 195 Mo. 606, deceased's son had hooked a wire over defendant's elevated electric wire and thereby created an electrical connection with a swing which the father touched and was killed; and if this had been all of the case doubt-less the son's act would have been held to be the proximate cause of the injury and the defendant absolved from liability. But in that case, the defendant negligently turned on the current without removing the "grounds" for which they had been looking. Hence it had notice that its electricity was escaping but did not know the precise way in which the injury could occur.

In the case at bar, the defendant had ample time in which to receive notice that its current was escaping to the telephone company's wire and stub post, and had no right to trust that nothing would ever arise on that line to cause injury from said escaped deadly agent. But whether this be true or not, certainly there was ample time to give defendant constructive notice of the likelihood of the hanging loose wire suspended from a pole so close to the stub post becoming a conductor of the deadly current to the ground or to within the reach of anyone who should touch the seemingly harmless wire. The demurrer to the evidence was properly overruled.

Instruction No. 4 for plaintiff is not open to the objections raised against it, namely, that it "permits a verdict for plaintiff by reason of uninsulated wire, regardless of whether negligently uninsulated or not," and "permits a verdict on the assumption that appellant was negligent in permitting proximity of power wire to guy wire and permits a finding without the jury making a finding that appellant was negligent," and "permits a recovery upon the doctrine of *res ipsa loquitur*" and "does not require a finding of facts even of negligence plead."

The instruction submitted to the jury the question of the maintenance of the high voltage wires, and of the telephone brace or guy wire "just above" the high voltage wires, and required the jury to find that said guy wire ran to the stub post, and that a loose wire ran therefrom to the ground "in such manner" that if the guy wire and high voltage wires came in contact, the guy wire and loose wire would become charged and become dangerous, and that the guy wire and high voltage wire were so near each other, and had been for a long time prior thereto (i. e., June 24, 1923), that the two could and would come in contact, and that the defendant "knew or by the exercise of reasonable care, should have known such facts" and if the jury further found that the high voltage wire was permitted to become uninsulated at the point where it might come in contact with the guy wire, and that it did come in contact therewith and, as a result, the guy wire and loose wire became charged with a dangerous voltage of electricity and that while said loose wire was so charged, the child came into contact with said loose wire and was in peril of serious bodily injury and death, and that plaintiff saw him and knew that if he were not quickly disengaged therefrom he would be killed, and that for the purpose of rescuing said child, plaintiff attempted to pull him away and thereby received a violent shock and injury, and "if you believe that the act of defendant in permitting said wires to be in such close proximity constituted negligence, and that such negligent act directly contributed to plaintiff's injury, if any, "then verdict should be for plaintiff unless they further found that plaintiff's acts and conduct were so rash and reckless as to constitute contributory negligence as defined in another instruction."

Instruction No. 7, of which complaint is made, did not cover the case nor direct a verdict. It merely told the jury that it was the duty of defendant to insulate its wires and to use a very high degree of care to keep the insulation in such condition as to make the wires rea-

sonable safe and failure to exercise such care would constitute negligence; that by the term "very high degree of care" is meant such care as would be ordinarily exercised under same or similar circumstances by cautious and prudent persons. engaged in the same line of business, and that negligence as used in the instructions meant the failure to use the degree of care and caution which prudent and careful persons would exercise under the same or similar circumstances. We see nothing wrong with it. [Hill v. Union Electric Light & P. Co., 260 Mo. 43, 46.]

Instruction No. 8 on the measure of damages is not "inartificially drawn" and does not suggest the amount of the verdict. It is in approved form and we see no objection to it.

The judgment is affirmed. All concur.