JOHN A. HOGAN v. FRED W. FLEMING et al., Receivers of Kansas City
Railways Company, Appellants.— 297 S. W. 404.

Division One, June 25, 1927.

1. **EVIDENCE: Custom: Conflicting.** Evidence tending to establish the
existence of a general, uniform and notorious custom of street cars and
their motormen to stop the cars when meeting a police patrol automobile
approaching from the opposite direction, although sharply conflicting, yet
if substantial, is sufficient to carry to the jury the question of the existence
of the clearly-pleaded custom.

2. **PLEADING: Custom: Negligence.** Inasmuch as a custom to stop street
cars on the approach of a police patrol automobile is not substantive in
character, but only evidenciary of defendant's negligence, it is not necessary
that such custom be pleaded.

3. **NEGLIGENCE: Proximate Cause: Jury Question.** Ordinarily the ques-
tion of proximate cause is one of .fact for the consideration and determina-
tion of the jury. It is not a question of science or of legal knowledge, but
is to be determined as a fact in view of the circumstances of fact attending
the injury.

4. ———: ———: **Intervening Cause.** The cause of the injury was the
proximate cause if it was the efficient cause which set in motion the chain of
circumstances leading up to the injury, and which in natural and continuous
sequence, unbroken by any new and independent cause, produced the injury.

5. ———: **Intervening and Superseding Cause: Concurrent Acts: Pedes-
trian: Automobile: Street Car.** It cannot be ruled as a matter of law that
the act of a pedestrian in suddenly stepping off of the west loading platform
and proceeding eastwardly across the street railway tracks on which a police
patrol automobile was running southward, and by which the driver of the au-
tomobile was caused to swerve. easterly and to strike a northbound street car
on the east tracks, whereby the plaintiff policeman riding in the patrol was
injured, was the proximate cause of the injury, or such an intervening
cause as superseded the primary negligence of the motorman in running
his street car into the narrow passway between the two loading platforms,
if the ordinances and customary use gave to the police patrol the right of
way and made it the duty of the motorman to stop his car, and the evidence
tends to show that had the motorman been reasonably attentive to the ap-
proach of the police patrol he could have discovered its approach in time to
have stopped the street car before it reached a position on the east tracks
opposite to the west loading platform. At most the act of the pedestrian
was only a concurring cause of the policeman's injury, and not a wholly
independent and superseding cause which completely broke the connection
between it and the alleged negligent act of the motorman.

6. ———: **Pedestrian on Street Railway: Anticipation.** The act of a pedes-
trian in stepping suddenly from the west loading platform upon the west
street railway tracks in front of a police patrol automobile approaching
on the west tracks, in a public street in the business district of a large city,
at a time when a considerable number of persons usually use the street
and west loading platform, is not such a happening as cannot be reasonably
foreseen and anticipated by the motorman of a street car moving on the
east tracks.

7. ———: **Anticipated Injury: Proximate Cause.** It is not essential that the
curred, or that he could have anticipated the exact manner in which it did
motorman of the street car could have foreseen the very injury which oc-
occur; it is sufficient if the injury could have been reasonably foreseen

from any one of a number of happenings, and that his negligence was the proximate cause of the injury.

8. INSTRUCTION: Emergency Call. An instruction which requires the jury to find that plaintiff was responding to an "emergency call" is not erroneous where the evidence is that he was a policeman and that a call had been sent into police headquarters, and that he and the driver of the police patrol automobile had been ordered to proceed with the patrol to a designated point in answer to the call, and that it was not customary for their superior officers to explain to them the precise nature of the call.

9. ————: Approach of Police Patrol: Actually Hearing Siren: Ordinary Care to Hear. An instruction requiring the jury to find that the siren of the police patrol automobile was sounded intermittently as it approached the point of collision, and that the motorman "saw or by the exercise of ordinary care could have seen, and knew, or could have known, by the exercise of ordinary care, of the approach of said automobile in time to have stopped said street car before the collision," correctly hypothesizes the law, and is not erroneous because it does not require the jury to find that the motorman actually heard the siren.

10. ————: Approach of Police Patrol: Full Stop of Street Car: Ordinance: Refused Instruction. The ordinances of Kansas City do not include street cars as among the vehicles which are required to stop on the approach of a police patrol automobile and to remain at a standstill until such patrol has passed; and therefore, in an action by a policeman, injured by the collision of a police patrol automobile with a street car, and in which he bases one ground of his right to recover upon the motorman's failure to obey an ordinance which he alleges required a street car to come to a full stop upon the approach of a police patrol, the refusal of an instruction asked by defendant and telling the jury that "the ordinance read in evidence does not require a motorman to stop his car when same is meeting a police patrol" is error. And the refusal of such an instruction is peculiarly hurtful where the plaintiff bases his right to recover on both the motorman's failure to observe an alleged universal custom of motormen to stop their cars upon the approach of a police patrol, and on the motorman's failure to obey such ordinance, and the evidence as to the existence of the custom is sharply conflicting, and his given instruction submits to the jury the question of the negligence of the motorman in violating both the ordinance and the custom, and tells them to return their verdict for plaintiff if they find "that said motorman negligently neglected to stop said street car."

11. ORDINANCE: Inclusion of Certain Things: Exclusion of Others. An ordinance enumerating the particular things upon which it is to operate is to be construed as excluding from its operation all other things. An ordinance which requires the driver of a street car to "immediately stop his car and keep it stationary upon the approach of any fire apparatus" cannot be construed to require a street car to stop immediately upon the approach of a police patrol.

12. ————: Construction: Duty of Court: Instruction. The construction and meaning of a city ordinance is a question of law for the court. It is error to give an instruction permitting the jury to determine whether an ordinance, whose meaning is not perfectly clear, requires a street car to come to a full stop when a police patrol approaches.

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J. Section 3015, p. 1033, n. 37; Section 3032, p. 1050, n. 85. Customs and Usages, 17 C. J., Section 80, p. 516, n. 95. Municipal Corporations, 43 C. J., Section 903, p. 569, n. 92; Section 904, p. 569, n. 94. Negligence, 29 Cyc., p. 491, n. 45, 46; p. 639, n. 4. Statutes, 36 Cyc., p. 1122, n. 47. Street Railroads, 36 Cyc., p. 1477, n. 8; p. 1611, n. 63; p. 1617, n. 99; p. 1639, n. 14.

Appeal from Jackson Circuit Court.—*Hon. Willard P. Hall*, Judge.

REVERSED AND REMANDED.

*Chas. N. Sadler* and *John R. Moberly* for appellants.

(1) The court erred in overruling the demurrer interposed at the close of plaintiff's evidence, and renewed at the close of all the evidence. (a) No negligence under ordinance was shown. Ordinance 28759, secs. 2, 5, 6, 9, 26. (b) No custom was properly pleaded or shown. Percell v. Railroad, 126 Mo. App. 53; Pankey v. Railway, 180 Mo. App. 185, 199; Railway Co. v. Lindeman, 143 Fed. 949; Shields v. Railway, 87 Mo. App. 637; Press Co. v. Stanard, 44 Mo. 71, 82; Bowman v. Car & Foundry Co., 226 Mo. 53; Guiney v. Railway Co., 167 Mo. 595. (c) Even if ordinance and custom were properly pleaded and disregarded, same was not the proximate cause of injury. Borack v. Mosler Safe Co., 288 Mo. 83; DeMoss v. Rys. Co., 246 S. W. 566; Woods v. Wells, 270 S. W. 335; Morris v. Power & Light Co., 258 S. W. 432; Smith v. Ozark Water Mills Co., 238 S. W. 575; Daneschocky v. Sieble, 195 Mo. App. 470; Harper v. Terminal Co., 187 Mo. 575; 29 Cyc. 488, 495. (2) The court erred in giving Instruction P-1 asked by respondent. (a) No evidence upon which to base it. Sims v. Railway Co., 116 Mo. App. 572; Steel v. Railway Co., 265 Mo. 110; Oglesby v. Railway Co., 177 Mo. 274; Jordan v. Transit Co., 202 Mo. 418. (b) Broadens issues made by pleadings. Moore v. Railway Co., 142 Mo. App. 294; Hall v. Coal & Coke Co., 260 Mo. 351; Davidson v. Transit Co., 212 Mo. 352; Roscoe v. Railway Co., 202 Mo. 576. (3) The court erred in refusing to give Instruction D-2 asked by appellants. Barton v. City of Odessa, 109 Mo. App. 81; Guiney v. Southern Elec. Ry. Co., 167 Mo. 595; Evans v. Foreman, 60 Mo. 453; Sadler v. Peoples, 105 Fed. 712; 1 Blashfield's Instructions (2 Ed.) 137.

*George H. Kelly, William Buchholz, Isaac B. Kimbrell* and *Martin J. O'Donnell* for respondent.

(1) The evidence in the case disclosed that defendants' motorman violated the provisions of the ordinance as construed by appellants and their predecessors operating the street railway in failing to give police patrol the right of way between cross streets in that the operator of said street car negligently failed to stop when the motorman heard or could have heard the siren sounding and negligently drove the street car between the loading docks after the patrol wagon entered the space between said docks and that said acts of negligence

were the proximate cause of the collision and injury to plaintiff. Smith v. Mederacke, 302 Mo. 538; Hogan v. Fleming, 265 S. W. 875; Shearman & Red. on Negligence, sec. 32; Buckner v. Horse & Mule Co., 221 Mo. 700; Kidd v. Ry., 274 S. W. 1079; Harrison v. Light Co., 195 Mo. 625; Obermeyer v. Chair Co., 229 Mo. 111; Dole v. Light Co., 121 La. 945; 29 Cyc. 488, 495; Lindman v. Kansas City, 271 S. W. 522; Shafir v. Sieben, 233 S. W. 419; Shafir v. Carroll, 274 S. W. 755; Adleman v. Altman, 209 Mo. App. 583; Southern Ry. Co. v. Webb, 116 Ga. 153; City of Louisville v. Hart's Admrs., 143 Ky. 171. (2) Had the defendants' motorman obeyed the city ordinance and the custom by stopping the electric street car at the time that he heard, or by ordinary attention should have heard, the siren sounding, the street car would have been stopped at the intersection of Eleventh Street and Grand Avenue, more than one-half block from the scene of the collision, and hence the collision would not have occurred, and therefore the negligence of the defendants' motorman was a proximate cause of the collision nd injury. Smith v. Mederacke, 302 Mo. 552; Nolan v. Rys., 247 S. W. 431; Caldwell v. Payne, 246 S. W. 317; Brunke v. Telephone Co., 115 Mo. App. 36; Gordon v. Railroad, 222 Mo. 536; Casson v. Luske, 277 Mo. 677; Kirkland v. Bixby, 282 Mo. 469; Storoski v. Publishing Co., 235 Mo. 76; Neibert v. Railroad, 232 Mo. 641; Shafir v. Sieben, 233 S. W. 419. (3) The ordinance and the custom place persons riding on fire or police vehicles in the same situation with reference to their rights over street cars and other vehicles to the use of the streets, and the rules applicable to drivers of ordinary vehicles do not control the question here involved. Farley v. Mayor, 152 N. Y. 222; Nolan v. Railways, 247 S. W. 431; Duffy v. Railways, 217 S. W. 883; Michael v. Railway, 161 Mo. App. 53; Green v. Railways, 165 Mo. App. 14; Taylor v. Railway, 166 Mo. App. 131; State v. Sheppard, 64 Minn. 287. (4) This is not a case where an independent intervening cause operated to break the causal connection between the negligence of the defendants and the resulting injury to the plaintiff, for the reason that the plaintiff was riding on a patrol wagon driven by a driver over which the plaintiff had no control, and even though the said driver was guilty of negligence or guilty of exercising bad judgment or good judgment in seeking to avoid injuring a pedestrian on the street in swerving his machine to the eastward, yet such negligence of the driver in legal contemplation was merely concurring negligence or negligence which concurred with the negligence of the defendants to produce the injury. Miller v. Railways, 155 Mo. App. 528; Dickinson v. Railway, 104 Mo. 491. (5) The ordinance of the city was enacted and adopted for the very purpose of preventing such an injury as that which resulted from the defendants' violation thereof, and consequently the de-

fendants' violation thereof was a proximate cause of the injury. Lindman v. Kansas City, 308 Mo. 161; Daneschocky v. Sieben, 195 Mo. App. 470; Shafir v. Sieben, 233 S. W. 419.

SEDDON, C.—This cause comes to the writer for opinion upon a reassignment. It is an action to recover damages for personal injuries alleged to have proximately resulted from the negligence of an employee of defendants (who at the time were the duly appointed receivers of the Kansas City Railways Company, a corporation) in the operation of a street car upon a public street in Kansas City. This is the second appeal in the cause. The first trial resulted in a directed verdict, and judgment for defendants. Plaintiff appealed to the Kansas City Court of Appeals, resulting in an opinion and judgment of that court reversing the judgment *nisi* and remanding the cause for a second trial. [Hogan v. Fleming, 265 S. W. 875.] Prior to the second trial, the petition was amended by increasing the amount of damages prayed from $7,500 to $50,000. The second trial resulted in a verdict and judgment for plaintiff in the sum of $15,000, from which the defendants were allowed an appeal to this court.

The evidence tends to show that, on February 16, 1921, the date of plaintiff's injury, plaintiff was a policeman, and, pursuant to his duties, he was responding to a call for a police patrol automobile sent in over the telephone to police headquarters. He was riding on the front seat of the police patrol automobile, which was driven and operated by a police chauffeur, one Pyeatt. The automobile was a left-hand drive, so that the chauffeur sat upon the left side of the front seat and plaintiff sat upon the right side of such seat. It was no part of plaintiff's duty to operate the automobile or to select the route to be traveled in responding to a call. The police patrol consisted of a large Packard chassis, upon which was placed a covered body. The words "Police Patrol" were painted upon the two sides of the automobile. Both plaintiff and the chauffeur were wearing the regulation police uniform. The police patrol was equipped with two signal devices, a gong and a siren. The sound of the siren is described in the record as a "screaming whistle," or shrill noise, and several witnesses testified that the sound of the siren could be heard a distance of from two to four or five city blocks. The police patrol was proceeding south upon Grand Avenue, a public street in the business district of Kansas City, having entered Grand Avenue at Seventh Street, and the casualty occurred in the city block between Tenth and Eleventh Streets. The police officers were directed to go to the corner of Twelfth and Oak Streets, located approximately two blocks south and two blocks east of the place of the casualty. Grand Avenue is a north-and-south street, the roadway proper being approximately 69 feet in width from curb to curb. Along the middle

of the roadway, the defendants operated a street railway, consisting of two parallel tracks. The south-bound street cars used the west track and the north-bound cars used the east track. The distance between the outer rail of each track and the nearest street curb was approximately 24 feet and 8 inches, so that the distance between the outer rails of the two car tracks was approximately 19 feet and 8 inches.

For some time prior to the casualty there was used in the operation of the street railway, in the block on Grand Avenue between Tenth and Eleventh Streets, two wooden platforms, or "loading docks," so called, one platform being adjacent to the outside rail of the west car-track and the other platform being adjacent to the outside rail of the east car-track. These platforms served as safety zones, upon which prospective street-car passengers stood while waiting to board the cars, and upon which passengers alighted when leaving the cars. The testimony is contradictory as to their exact size and relative locations upon the street. Plaintiff's witnesses testified that they were from 80 to 100 feet in length, three to four feet in width, and extended some six to eight or ten inches above the street pavement. Some of the witnesses testified positively that the loading platforms were located directly opposite each other, while other witnesses were equally positive in their testimony that the east platform was located some distance north of the west platform, and that the distance between lines drawn at right angle to the south end of the east platform and to the north end of the west platform was from 40 to 75 feet; in other words, that the south end of the east platform was from 40 to 75 feet north of the north end of the west platform. Plaintiff's witnesses fixed the location of both loading platforms as nearer Tenth Street than Eleventh Street, placing both platforms in the north half of the block. On the other hand, defendants' witness, Bales, purporting to testify to actual measurements made by him, fixed the south end of the west platform as distant some 40 or 50 feet north of the north property line of Eleventh Street, and the north end of the east platform as distant some 15 feet south of the south property line of Tenth Street. The length of the block on Grand Avenue between Tenth and Eleventh Streets is not shown in the record. There is some testimony on behalf of plaintiff that a building was undergoing construction or repair on the west side of Grand Avenue, and a temporary walk had been laid in the street, thereby obstructing vehicular traffic on the west side of the street. It is not clearly or definitely shown in the record whether this temporary walk lay north of the west loading platform, or whether it lay between the platform and the west curb, but there is testimony that the temporary walk so obstructed south-bound vehicular traffic as to permit but one ve-

317 Mo. Sup.—34.

hicle at a time to pass between the west loading platform and the west curb.

The foregoing is a fairly accurate description of the *locus in quo,* as we gather it from the record.

The casualty occurred on a clear day, during the noon hour, about 12:30 or 12:45 o'clock. The police chauffeur testified that there were some 25 to 40 persons standing upon the west loading platform, and there was testimony that a number of pedestrians were walking upon the sidewalks on both sides of Grand Avenue and that there were a number of automobiles traveling on both sides of the roadway. Both plaintiff and the police chauffeur testified that, upon entering Grand Avenue and proceeding south from Seventh Street, the automobile siren was blown intermittently, two or three times to each block; that the police automobile was being driven along the west, or south-bound, railway track, with the wheels of the automobile astride the west track; that it was customary to drive the police patrol along the right-hand car track in making a run and responding to a call; that, when the automobile was nearing Tenth Street, a woman started to cross Grand Avenue, and the automobile was slowed down almost to a standstill, and the driver sounded the siren twice before the woman stepped back out of its way; that the siren was sounded four or five times south of Ninth Street; that, when the automobile was at, or closely approaching, the north end of the west loading platform, a man suddenly stepped off the north end of the west loading platform and took two or three steps to the east, with his head down and apparently oblivious of his danger, directly into the path of the oncoming police patrol; that the man was from 10 to 20 feet distant from the automobile when he stepped from the platform; and that the driver of the police automobile, upon observing the man, sounded the the siren as a warning, but the approaching automobile was then so close to the man that it appeared impossible to stop the automobile to avoid striking him, whereupon the driver of the automobile suddenly swerved or veered the automobile to the left, or east and immediately collided with the left front corner of defendants' northbound street car, which was approaching on the east railway track. Plaintiff's witnesses testified that the distance between the two loading platforms was 18 or 20 feet, and, when there was a street-car on the east track, the distance between the street-car and the west loading platform was 10 or 12 feet. The speed of the automobile just prior to the collision was given by plaintiff and the chauffeur at 12 to 17 miles an hour, while other witnesses estimated its speed at 35 to 50 miles an hour. The street-car, just prior to the collision, had been traveling at a speed of five or six miles an hour, and, according to several of the witnesses, had about come to a stop. Defendants' motorman testified that he was making the stop for the east,

or Tenth Street, platform, and that the police automobile was 15 or 20 feet distant from the front end of the street car when the automobile veered to the left, or east, to avoid striking the pedestrian. Notwithstanding the effort made by the police chauffeur to avoid striking the pedestrian, the rear end of the police patrol struck and injured him. The automobile was practically demolished by the collision, and both plaintiff and the chauffeur were thrown through the windshield of the automobile upon the street pavement and suffered injuries therefrom.

There is some evidence that, at the time the police patrol reached the north end of the west loading platform, the street car was nearing, but had not yet reached, the south end of the west platform. Defendants' motorman testified that he had entirely passed the west loading platform by some 20 or 30 feet, and had reached the south end of the east loading platform. The motorman testified that he could have stopped the street car within a very short distance; that he had made a safety stop on the south side of Eleventh Street, and, receiving a signal from the traffic policeman at Eleventh Street to proceed northwardly, he ran his car northwardly at a speed of eight or ten miles an hour until he began to slow down for the east loading platform, when he observed the police automobile veer or swerve toward his car, and he applied the air emergency brakes and "stopped right then." The motorman furthermore testified that he did not hear the siren at any time before the collision, in which testimony he is corroborated by several passengers upon the street car, who testified that they did not hear the siren. Other witnesses, pedestrians upon the street, testified to having heard the siren before and after the police automobile reached Tenth Street. The traffic policeman at Eleventh Street testified that, after he signaled the street car to proceed northwardly and the car had crossed Eleventh Street, he heard the siren of the automobile and located the approaching automobile between Ninth and Tenth Streets, whereupon he sounded his policeman's whistle to check or stop the traffic across Grand Avenue.

An ordinance of Kansas City in effect at, and prior to, the time of the casualty, was put in evidence by plaintiff, the applicable provisions of which are as follows:

"Section 5. Police, fire department, fire patrol, United States mail vehicles and ambulances shall have the right of way in any street.

"That upon the approach of any fire apparatus, police patrol or ambulance, every vehicle shall draw up as near as practicable to the right curb of the street and remain at a standstill until such apparatus, patrol or ambulance shall have passed.

"The driver of a street car shall immediately stop his car and keep it stationary upon the approach of any fire apparatus.

"Section 6. Street cars shall have the right of way, between cross streets, over all other vehicles, except as provided in Section 5. . . .

"Section 9. Vehicles shall be driven in a careful manner and with due regard for the safety and convenience of pedestrians and all other vehicles.

"Every person using any vehicle on any street in the city of Kansas City, shall operate, drive or ride such vehicle on the portion to the right of the center of the street, except where the right side of the street is in such condition as to be impassable."

Section 2 of said ordinance defines the word "vehicle" as including "equestrians, led horses, and everything on wheels, or runners, *except street cars* and baby carriages," and Section 23 of the ordinance prescribes the kind of warning signals or devises to be used on vehicles, and in effect prohibits the use of sirens on all vehicles, except "public ambulances, vehicles belonging to the fire and police departments of the city or vehicles required to respond to alarms of fire and other emergency calls."

Plaintiff offered evidence tending to show the existence, at and prior to the time of the casualty, of a general custom or usage on the part of the operatives of street cars in Kansas City to stop such cars upon hearing the sound of a siren of a police, fire or other public vehicle. Defendants, on the contrary, offered evidence tending to show that no such general custom existed at such time, but that it was then, and for a long time had been, customary for the motorman to proceed with his car when the police patrol is approaching from the opposite direction in which the street car is moving. Defendants' motorman, however, testified upon cross-examination, as follows: "Q. Well, do you stop when you hear the sirens? A. Yes, sir, for the fire departments and ambulances. Q. Aren't you so instructed in your work to stop when you hear siren whistles—aren't those your instructions from the company? Isn't that right? A. I am, if the street car blocks. Q. When you were broken in, as part of your duties, were you not instructed, whenever you heard the siren, to stop your car? A. Yes. Q. And haven't you a printed book of rules to that effect? A. Yes, sir. Q. And it says whenever you hear the siren, stop your car, and you follow that custom, don't you? A. Yes, sir. Q. And did on all the lines of Kansas City, the whole time you worked? A. Yes, sir. Q. And if you had known that this machine was coming, if it had been blowing the siren, you would have immediately stopped at a place like Grand Avenue? A. Yes, sir."

Both plaintiff and the driver of the police patrol testified that they saw the approaching north-bound street car upon the east railway track when the police patrol was crossing, or had just crossed, the Tenth Street intersection, but that they thought or "expected" (re-

lying upon the aforesaid alleged custom, of which they both testified they had knowledge) that the motorman would stop the street car.

Inasmuch as reference will be made in the course of our opinion to the specific acts of negligence pleaded and the issues joined by the pleadings, it is appropriate that we state the substance of the pleadings. The petition, in substance, charges the appointment of defendants as receivers of the railway corporation and that said receivers were operating the railway on Grand Avenue at the time of plaintiff's injury; that there were maintained, as a part of said railway, board sidewalks on Grand Avenue, between Tenth and Eleventh Streets, on both the west and east sides of said streets; that there was in force and effect at said time, and long prior thereto, a certain ordinance of Kansas City (heretofore referred to) and the petition sets out *in haec verba* the applicable sections of said ordinance; that the board sidewalks maintained by the defendant receivers were so near together that a north-bound street car on the east track of said railway, passing between said sidewalks, so narrowed the passageway that a south-bound automobile, or police patrol, going rapidly could not safely proceed southward between said sidewalks, all of which defendant receivers well knew, or by the exercise of ordinary care might have known; "that it has long been the custom and the practice and relied upon by plaintiff at the time herein for operators of street railway cars, when a police patrol automobile was approaching, to bring said street cars to a stop and thus to give the right of way to the police patrol over and along said streets"; that plaintiff was a police officer of Kansas City and that it was his duty, when ordered by his superior officers, to take his seat in the police patrol automobile and to permit himself to be driven by a driver, designated and appointed by plaintiff's superior officer, to such point in the city as it was necessary for him to go in answer to emergency calls sent in to the police department; that plaintiff at the time was ordered to respond to such an emergency call and to take his seat in the police patrol and to be driven, as aforesaid, over said Grand Avenue and between the board sidewalks so maintained between Tenth and Eleventh Streets; that plaintiff had no supervision, or right of direction or control, over said driver; that he was driven by a properly designated driver, and was riding in the police patrol in the discharge of his duties to answer an emergency call; and "that, as they were driving through said narrow passageway, between the board sidewalks, at or near Tenth Street and Grand Avenue, as aforesaid, a street car north-bound approached the opening between said sidewalks and it was the duty of the driver of said street car to stop said street car and permit the said police patrol to have the right of way through said opening between the sidewalks aforesaid; that the driver of said street car knew before he drove his street car into the

narrow space between said board sidewalks, or, by the exercise of ordinary care, might have known, that said police patrol was proceeding through the opening between said sidewalks at a very rapid pace, and that the driver of said police patrol expected the driver of the street car to stop at a point south of said board sidewalks and to give the said police patrol the right of way through said opening, but that the driver of said street car carelessly and negligently failed to stop said car and drove the same at a rapid pace northward over the north-bound tracks, and between the board sidewalks aforesaid, so that the police patrol on which plaintiff was riding and the street car, so negligently driven into the space between said board sidewalks, came into collision,'' and plaintiff was injured thereby. The answer is a general denial.

I.  Appellants contend that their peremptory instructions in the nature of demurrers to the evidence, requested at the close of plaintiff's case and renewed at the close of all the evidence, should have been given, and that the trial court erred in refusing such

**Custom.**  instructions.  It is claimed that the petition does not plead, and that the evidence does not establish, the existence of a general, uniform and notorious custom or practice on the part of appellants and their motormen to stop their street cars when meeting a police patrol automobile approaching from the opposite direction in which the street cars are traveling, and that it is neither pleaded nor shown by the evidence that the plaintiff and the driver of the police patrol had knowledge of the existence of such custom and relied upon its observance at the time of the casualty.  The petition specifically alleges that ''it has long been the custom and the practice and relied upon by plaintiff at the time herein for operators of street railway cars, when a police patrol automobile was approaching, to bring said street cars to a stop and thus to give the right of way to the police patrol over and along said streets.''  While the evidence is sharply conflicting as to the existence and universality of the alleged custom, yet we cannot say that there is no substantial evidence of the existence and universality of such custom.  Both plaintiff and the driver of the police automobile testified that they knew of the existence of the custom and that they relied upon its observance at the time of the casualty.  Appellants' motorman (although it is true that he attempted later to qualify such testimony) testified that he had been instructed, as a part of his duties, to stop his car whenever he heard the siren; that he followed such custom; and that, had he heard the siren and known the police patrol automobile was approaching, he would have immediately stopped his car.  We think that it was the province of the jury, under proper instructions, to weigh the evidence, and to reconcile the conflict therein, respecting the exist-

ence and universality of the custom. [Percell v. Railway Co., 126 Mo. App. 43.] While we think that the existence of the custom was sufficiently pleaded herein, nevertheless it has been ruled in this State that, inasmuch as custom is not substantive in character, but merely evidentiary of defendants' negligence, it is not necessary that such custom shall be pleaded. [Brunke v. Telephone Co., 115 Mo. App. 36; Caldwell v. Payne, 246 S. W. 312, 317; Gordon v. Railway Co., 222 Mo. 516, 536; Cassin v. Lusk, 277 Mo. 663, 678.]

Appellants contend that regardless of whether the motorman was, or was not, negligent in failing to stop his car upon the approach of the police patrol, nevertheless such act or omission of the motorman, if found to be a negligent act or omission, was not the **Proximate** proximate cause of plaintiff's injury. It is urged that the **Cause.** evidence is undisputed that, had the automobile continued, without changing its course, along the west railway track, it would have passed the street car upon the east railway track without coming in contact therewith, and without any danger of a collision. In other words, it is claimed by appellant that it appears from all the evidence in the case that an independent, intervening and efficient cause—namely, the act of the pedestrian in stepping off the west loading platform directly in front of the on-coming police patrol, thereby causing the driver of the police patrol automobile to swerve or veer the automobile to the east, or left, in response to a humanitarian impulse, so as to avoid striking and injuring the pedestrian, over which act appellants had no control and which their motorman had no reason to anticipate—was the proximate cause of the collision, without the intervention of which independent and efficient cause the collision would not have occurred.

While the determination of the question of proximate cause may sometimes be one of law for the court, ordinarily it is one of fact for the consideration and determination of the jury. [Laughlin v. Railway Co., 275 Mo. 459, 465; Kidd v. Railway Co., 310 Mo. 1, 28; Johnson v. Construction Co., 188 Mo. App. 105, 121; Gilman v. Fleming, 265 S. W. 104, 106.] It is pointedly said, in Railway Company v. Kellogg, 94 U. S. 469: ''The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. . . . In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time.''

The rule, as to when the cause of the injury is proximate, in thus clearly stated in 29 Cyc. 491: "It is sufficient if it be the efficient cause which set in motion the chain of circumstances leading up to the injury, and which in natural, continuous sequence, unbroken by any new and independent cause, produced the injury. The primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the one so operating on the others as to make the injury the result of the primary cause."

In Shearman & Redfield on the Law of Negligence (6 Ed.), vol. 1, p. 66, sec. 32, the rule is thus clearly stated: "The connection between the defendant's negligence and the plaintiff's injury may be broken by an intervening cause. *In order to excuse the defendant, however, this intervening cause must be either a superseding or a responsible cause.* It is a superseding cause, whether intelligent or not, if it *so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree,* produces the injury. . . . But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation." (Italics ours.)

In Harrison v. Electric Light Co., 195 Mo. 606, 625, MARSHALL, J., speaking for this court, reviews the prior decisions of this court on the question of proximate cause and announces this conclusion: ". . . But the foregoing cases are sufficient to demonstrate that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable although his negligence was not the sole negligence or the sole proximate cause, and although his negligence without such other independent, intervening cause would not have produced the injury." The foregoing decision is cited with approval, and the conclusion of law therein announced has been followed, in Hickman v. Light & Power Co., 226 S. W. 570, 574, and Hohimer v. City Light & Traction Co., 218 Mo. App. 138, 150.

Applying the foregoing rules or principles of law to the facts and circumstances in evidence, we are unwilling to say, as a matter of law, that the alleged negligent act or omission of the motorman in failing to stop his car was not a proximate cause of plaintiff's injury, or that the connection between such alleged negligent act and plaintiff's injury, and the sequence or succession of events immediately following such alleged negligent act of the motorman and resulting in plaintiff's injury, was dissevered or broken by an entirely independent, intervening and superseding cause. In other words, we think it was the province of the jury, under all the circumstances in

evidence, to determine, as a matter of fact, whether plaintiff's injury proximately resulted from the alleged negligent act or omission of defendants' motorman.

The evidence herein tends to show that, had the motorman been reasonably attentive to the approach of the police patrol, he could have discovered its approach in time to have stopped the street car before the car reached a position on the east railway track opposite, or in immediate proximity to, the west loading platform. There is substantial evidence that the street car was in motion and traveling toward the approaching police patrol when the pedestrian stepped off the west loading platform and the driver of the police patrol swerved the automobile to the east, or left. The defendant's motorman testified that he was making the stop at the east loading platform when he saw the police patrol "coming in towards me," from which testimony the jury might have reasonably and properly drawn the inference that the street car was still in motion when the police patrol swerved or veered toward the street car. It therefore appears that the alleged negligent act of the motorman had not ceased at the time the pedestrian stepped from the west loading platform, but that such act of the motorman continued up to the very moment of the collision. At most, the act of the pedestrian in stepping from the west loading platform directly in front of the on-coming police patrol, thereby causing the driver of the police patrol to veer the automobile to the left to avoid injuring the pedestrian, was a concurring cause of plaintiff's injury, and not a wholly independent and superseding cause which completely and entirely dissevered or broke the connection between the alleged negligent act of defendant's motorman and plaintiff's injury. In other words, the alleged negligent act or omission of the motorman was *one* of the proximate causes of plaintiff's injury, notwithstanding the fact that other causes may have *concurred or participated* therewith to cause the injury. [Newcomb v. Railroad Co., 169 Mo. 409, 422; Harrison v. Light Co., 195 Mo. 606, 623; Hickman v. Light & Power Co. (Mo. Sup.), 226 S. W. 570, 574; Hohimer v. Light & Traction Co., 218 Mo. App. 138, 150.]

Furthermore, we cannot say that the act of the pedestrian in stepping from the west loading platform directly into the path of the approaching police patrol was such a happening, or circumstance, as could not have been reasonably foreseen or anticipated by the motorman operating appellants' street car. The casualty occurred upon a public street in the business district of the city during the noon hour of the day, and at a time when (the evidence tends to show) there were a considerable number of persons using the street and the west loading platform. The evidence also tends to show that, when a north-bound street car occupied the east railway track at a position opposite the west loading platform, there was a space, at most, of but ten or twelve feet between

**Anticipated Injury.**

such street car and the west loading platform through which the approaching police patrol could pass. It appears from the evidence to have been customary for the police patrol, in traveling south on Grand Avenue, to pursue a course approximately near, and immediately to the right of, the middle of the roadway and astride the rails of the west, or south-bound, railway track. It is a matter of common knowledge and observance that pedestrians frequently and heedlessly attempt to cross the street in front of approaching vehicles, and operatives of street cars and motor vehicles should always be alert to avoid the consequences of such heedless conduct on the part of pedestrians. Besides, we think that it is not beyond the bounds of reasonable probability, and therefore to be reasonably anticipated by the motorman, that the front wheels of the rapidly approaching police patrol might come in contact with a loose rock or other inanimate object, or strike a depression in the street pavement, thereby causing the police patrol to veer suddenly to the east, or left, from its previous course, and, by reason of the narrow passageway between a moving street car upon the east railway track and the west loading platform, be caused to come into collision with the moving street car before the driver of the police patrol could turn the automobile back into its prior course. It is not essential that defendants' motorman could have foreseen the very injury which resulted, or that he could have anticipated the exact manner in which the injury did occur, but it is sufficient if the negligence of defendants' motorman was a proximate cause of the injury. [Buckner v. Horse & Mule Co., 221 Mo. 700; Harrison v. Light Co., 195 Mo. 606, 629; Benton v. St. Louis, 248 Mo. 98, 110; Daneschocky v. Sieble, 195 Mo. App. 470, 479.]

We have given careful and thoughtful consideration to the announcements and legal conclusions of this court in Borack v. Safe Co., 288 Mo. 83; DeMoss v. Railways Co., 296 Mo. 526; and Wood v. Wells, 270 S. W. 332, cited by appellants, but an analysis of the facts upon which our conclusions of law were predicated in those cases convinces us that such legal conclusions are not applicable to the facts and circumstances disclosed by the evidence in the case at bar. We are of the opinion that the trial court rightly refused the peremptory instructions requested by the defendants herein, for we think that it was a matter of fact to be determined by the jury whether, in view of all the facts and circumstances in evidence, the defendants' motorman was negligent in failing to stop his car when, by the use of his senses of hearing and sight, he reasonably could have discovered the approaching police patrol in time to have stopped the street car before the car reached the south end of the west loading platform. Likewise, we think that it was a matter of fact for the de-

termination of the jury whether such act or omission of the motor-
man was a proximate cause of plaintiff's injury.

II.   Appellants assign error in the giving of plaintiff's Instruc-
tion P-1, which is as follows:

"The court instructs the jury that if you believe and find from
the evidence that on the 16th day of February, 1921, the plaintiff
was riding south on Grand Avenue in the police patrol automobile,
mentioned in evidence, in response to an emergency call, if he was;
that at said time and place there was an ordinance in force in
Kansas City, Missouri, providing that police, fire department, fire
patrol, United States mail vehicles and ambulances shall have
the right of way in any street, and that street cars
**Instruction.**  shall have the right of way between cross streets, over
all other vehicles except as provided in said ordinance, and that
an ordinance of said city permitted the use of sirens on vehicles
belonging to the police department of the city, responding to emer-
gency calls, and that at said time and place and for some years
prior thereto a custom had been observed by the defendants' motor-
men, to the knowledge of plaintiff and the driver of the said police
patrol automobile, to bring street cars to a full stop upon the ap-
proach of a police patrol automobile responding to an emergency
call whenever warning was given by a siren of its approach, and to
keep such street car stopped until said police automobile should
have passed; and if you further find and believe from the evidence
that at the time of the collision mentioned in evidence, and prior
thereto, the plaintiff and the driver of the said police patrol auto-
mobile knew of and relied upon said ordinances and said custom,
if any; and if you further believe and find from the evidence that
the plaintiff, while riding upon the police patrol automobile, men-
tioned in evidence, was responding to an emergency call and that
the police patrol automobile as it approached the point of the
collision mentioned in evidence, after it had gotten upon Grand
Avenue from 7th Street, was intermittently sounding the siren
thereon mentioned in evidence, and that the motorman employed
by the defendants, operating the northbound street car mentioned
in evidence, saw or by the exercise of ordinary care could have
seen and knew, or could have known, by the exercise of ordinary
care on his part, of the approach of the said automobile in time
to have stopped said street car before the collision mentioned in
evidence, and that the said motorman negligently neglected to so
stop said street car, if he did, and that as a direct result of the
said negligence, if any, the said street car collided with the said
police patrol automobile and that as a direct result of the said
negligence, if any, the plaintiff was injured, then your verdict
must be for the plaintiff."

It is claimed that the instruction is erroneous in submitting to the jury the hypothesis that the police patrol was responding to an "emergency call," whereas there is no evidence that the police patrol was making an emergency run. The evidence tends to show that plaintiff and the driver of the police patrol were ordered to proceed with the police patrol to Twelfth and Oak Streets in answer to a call, and that it was not customary for their superior officer to tell them the precise nature of the call. So far as either the plaintiff or the driver knew, they may have been responding to a riot call, or to prevent some breach of the peace or other disturbance inimical to the public welfare and safety. Presumably, they were expected to reach their destination in as short a time, and by as direct a route, as the police patrol could be reasonably driven from police headquarters to the place of origin of the call. In the ordinary understanding and use of the term, we believe that the call to which plaintiff responded may be properly designated as an "emergency call." We do not think that the jury were misled by the use of the term "emergency call," nor do we think that the instruction, in the respect mentioned, can be said to be beyond the scope of the evidence.

Another criticism leveled against the instruction is that, while the instruction required the jury to find that the siren was being sounded intermittently as the police patrol approached the point of collision, it did not require the jury to find that the motorman operating defendants' street car heard the siren. The instruction did require the jury to find that the motorman "saw or by the exercise of ordinary care could have seen *and knew, or could have known,* by the exercise of ordinary care on his part, of the approach of the said automobile in time to have stopped said street car before the collision." Knowledge of the existence of a fact is usually and ordinarily acquired by means of the senses of sight and hearing. If the jury found, as they evidently did, that the motorman knew, or by the exercise of ordinary care could have known, of the approach of the police patrol, then it matters not, so far as we see, whether the motorman was apprised of the approach of the police patrol, or could have known of its approach, by the senses of both sight and hearing, or by only one of such senses. We regard the criticism of the instruction as hypercritical. Viewing the instruction as a whole and in its entirety, and considering the context thereof, we do not believe that the instruction was misleading to the jury, and hence we are of the opinion that no reversible error was committed by the trial court in the giving of the instruction.

III. Appellants assign error in the refusal of their requested Instruction D-2, as follows: "The court instructs the jury that

the ordinance read in evidence does not require a motorman to stop his car when same is meeting a police patrol." This instruc-

**Ordinance.** tion calls for a construction of the ordinance of Kansas City which was pleaded in the petition and put in evidence by plaintiff. It is insisted by appellants that Section 5 of said ordinance, relied upon by plaintiff as the measure of the alleged negligent act or omission of the motorman, imposes no duty upon the motorman to stop his car upon the approach of a police patrol automobile. The said section of the ordinance provides that "police, fire department, fire patrol, United States mail vehicles and ambulances shall have the right of way in any street" and "that, upon the approach of any fire apparatus, police patrol or ambulance, every *vehicle* shall draw up as near as practicable to the right curb of the street and remain at a standstill until such apparatus, patrol or ambulance shall have passed." It is urged by appellants that the clause which requires every *vehicle* to draw up as near as practicable to the right curb of the street and to remain at a standstill upon the approach of any police patrol has no application to a street car, which runs upon a fixed track, thereby making it impossible for a street car to be drawn up to the right street curb, and in further view of the fact that Section 2 of the ordinance specifically defines the word "vehicle," as used therein, as including "everything on wheels, or runners, *except street cars* and baby carriages." The last clause of Section 5 provides that "the driver of a street car shall immediately stop his car and keep it stationary *upon the approach of any fire apparatus.*" It seems clear to us that the descriptive words "fire apparatus" were not intended by the framers of the ordinance to include police patrols, United States mail vehicles and ambulances, which vehicles are specifically mentioned in connection with fire department vehicles in the first clause of Section 5 of the ordinance, which clause grants to all such described vehicles the *right of way* in any street. If the framers of the ordinance had intended that the ordinance should make it mandatory upon the driver of a street car to immediately bring his car to a complete and full stop, and to keep it stationary, upon the approach of any police patrol, United States mail vehicle and ambulance, the last clause of Section 5 doubtless would have been drawn so as to include such vehicles, together with fire department apparatus or vehicles. On the contrary, the last clause of Section 5 expressly mentions and plainly singles out "fire apparatus" and manifestly excludes from the operation of said clause police patrol, United States mail vehicles and ambulances.

One of the well recognized rules in the construction of public ordinances and statutes is the application of the maxim, "*expressio unius est exclusio alterius.*" Therefore, it is the generally accepted

rule of construction that, where an ordinance or statute enumerates or prescribes the particular thing upon which it is to operate, it is to be construed as excluding from its effect and operation all those things not expressly mentioned. [36 Cyc. 1122·] "The affirmative description of the cases in which the jurisdiction may be exercised implies a negative on the exercise of such power in other cases." [25 R. C. L. 981, 982.] Plaintiff argues that a police patrol cannot be given the right of way in a street over a street car unless the street car be brought to a full and complete stop and held stationary until after the police patrol has passed the street car. We regard this argument, however, as a *non sequitur*. It may well be possible and feasible, and apparently in full accord with the manifest intention of the framers of the ordinance, for a police patrol to be given the right of way in the street by the mere slackening of the speed of the street car, without bringing the street car to a complete stop and holding it stationary. If the framers of the ordinance had intended otherwise, doubtless they would have included and expressly mentioned police patrol vehicles with "fire apparatus" in the concluding mandatory clause of Section 5, which they did not see fit to do.

The construction and meaning of municipal ordinances is a question of law for the court. "The determination of the existence and proper construction of statutes are questions of law, and an instruction which permits the jury to construe the provisions of a statute is erroneous. Thus, it is erroneous to give an instruction permitting a jury to determine whether a master has violated a statute as to guarding machinery, without stating the obligations imposed on the employer by the statute . . . The construction of municipal ordinances is also a question for the court, and it is error to submit to the jury, without construction by the court, an ordinance, the meaning of which is, as to the point in controversy, not perfectly clear." [Blashfield's Instructions to Juries (2 Ed.), vol. 1, sec. 68, pages 135-138.] "It is the exclusive function of the court to construe and declare the meaning of papers and documents, like . . . ordinances and domestic statutes. The construction of these papers and documents may not be submitted to the jury." [Branson's Instructions to Juries (2 Ed.), sec. 8, pp. 8, 9.] In Barton v. City of Odessa, 109 Mo. App. 76, 82, it is pertinently said: "The objection to this instruction is that it left to the jury to apply these ordinances, which contained the law of the city, in their own way without any direction from the court. It may have been a question of fact whether such ordinances were in force, but that fact having been admitted by defendant's answer, their application became a matter of law solely for the construction of the court." In Sadler v. Peoples, 105 Fed. 712, the syllabus, supported by the opinion, reads: "Where an ordinance introduced

in evidence, and which has a bearing on a question in issue, is not clear in its meaning, it is error to submit the case to the jury without a construction of such ordinance by the court."

The harm occasioned to appellants by the refusal of their Instruction D-2 is readily apparent. Plaintiff, by his Instruction P-1, which presented his theory of recovery, submitted to the jury the question of the negligence of the motorman in violating *both* the ordinance and the alleged custom, and told the jury, in effect, if they found and believed from the evidence "that said motorman negligently neglected to so *stop* said street car," their verdict must be for the plaintiff. The evidence respecting the existence and universality of the alleged custom was sharply conflicting, and it was strenuously contended by defendants throughout the trial that there existed no general and uniform custom on the part of defendants' motormen to stop their street cars when meeting a police patrol approaching the street cars from an opposite direction. The meaning of the ordinance in evidence may not have been clear to the lay minds of the jury, and they may have understood and construed the ordinance to require the motorman to bring his street car to a complete stop and keep it stationary upon the approach of a police patrol, as well as upon the approach of fire apparatus. We have no means of knowing whether the jury, by their verdict, convicted the motorman of negligence in violating the ordinance, or in failing to observe the alleged custom, or of both. In view of the sharp conflict in the evidence respecting the existence of the alleged custom, the jury may have reached the conclusion that no such uniform custom existed, but that, nevertheless, the motorman violated the ordinance in evidence in failing to bring his car to a complete stop and keep it stationary until the police patrol passed the street car. The trial court should have construed the ordinance and instructed the jury as to its meaning and operation, as requested in defendants' Instruction D-2, thereby removing from the minds of the jury any misunderstanding or misconception of the meaning and operation of the ordinance with respect to the issue of the negligence of appellants' motorman, submitted to them by plaintiff's Instruction P-1. We are of the opinion that reversible error was committed by the learned trial court in the refusal of defendants' requested Instruction D-2.

Other alleged errors in the admission of evidence and in the refusal of requested instructions are assigned by appellants. We see no reason for prolonging this opinion by a discussion of such assignments. Doubtless, upon a retrial of the case, the testimony may be offered in different manner and substance, and the instructions may differ in form and language from those requested at the last trial, thereby rendering inapplicable the criticisms raised upon this appeal. While it is strenuously urged by appellants that the

court erred in the refusal of their Instruction D-15, relating to the alleged general custom of the motormen to stop their cars when, meeting a police patrol automobile, we are not convinced that the trial court was guilty of reversible error in the refusal of such instruction in the peremptory form and language in which it was presented and requested.

It follows, because of the error pointed out herein in the refusal of defendants' Instruction D-2 aforesaid, that the judgment of the trial court must be reversed and the cause remanded for retrial. It is so ordered. *Lindsay, C.,* concurs: *Ellison, C.,* not sitting.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.